STATE OF MINNESOTA *vs.* THOMAS J. PEARCE.

. Argued Dec. 5, 1893.   Affirmed Jan. 15, 1894.

No. 8592.

**Dying declarations.**

Where, as in this case, the death of the deceased is the subject of the charge in the indictment, and the circumstances of the death are the subject of the dying declarations which were received as evidence on the trial of the defendant, it was not error for the trial court to instruct the jury "that such declarations are admitted only when made under a belief, on the declarant's part, of impending death, and because, as it is reasoned, that one so situated will speak the truth as fully as if under oath and on the witness stand;" nor was it reversible error on the part of the trial court in refusing defendant's request to instruct the jury as follows, namely: "You are instructed that the declarations of the deceased are not to be received with the same credit as though she had testified to the same under oath upon examination." It is the province of the jury, and not that of the court, to give the proper credit and weight to dying declarations, when legally admitted as evidence.

**Competent although her husband was an accomplice.**

Where the defendant has committed the crime of manslaughter upon a woman, whose husband was an accomplice in the commission of such crime,. her dying declarations may be admitted in evidence against such defendant.

**Defendant's failure to testify must not be mentioned in Judge's charge to the jury.**

Where, in a criminal trial, the defendant neglects or refuses to testify in his own behalf, as provided by 1878 G. S. ch. 73, § 7, the trial court has no right or authority to allude to or comment upon such refusal before the jury, nor to refer to the subject or instruct them as to whether they shall consider such neglect in any manner whatever.

Appeal by defendant, Thomas J. Pearce, from an order of the District Court of Ramsey County, *William Louis Kelly,* J., made March 31, 1893, denying his motion for a new trial.

*W. W. Erwin,* for appellant.

The Court erred in holding that the dying declaration of the woman was a sufficient corroboration of the testimony of her husband to warrant a conviction of the doctor. Her husband was an

accomplice in the offense and no conviction can be had upon his testimony unless he was corroborated by evidence tending to connect the doctor with the commission of the offense. 1878 G. S. ch. 73, § 104.

The provision at the end of 1878 G. S. ch. 94, § 17, is not repealed by Penal Code, § 541, and no conviction can be had under Penal Code, § 162, upon the uncorroborated evidence of the woman. Hence, her dying declaration was not sufficient corroboration of the husband to warrant a conviction of the doctor. It would require other testimony than that of the husband, the accomplice, to convict. The disability of the woman under this statute is identical with that of an accomplice, and may be considered as such. When two or more accomplices are produced as witnesses, they are deemed not to corroborate each other, but the same rule is applied and the same corroboration required as if there were but one. 1 Greenl. Ev., § 381; *United States* v. *Hinz*, 35 Fed. Rep. 272; *Rex* v. *O'Neal*, 7 C. & P. 168.

The Court instructed the jury that proof is beyond all reasonable doubt when it is such that it would impress the judgment of ordinarily prudent men with a conviction upon which they would act without hesitation in their own most important affairs and concerns of life. This we submit is not accurate. *State* v. *Dineen*, 10 Minn. 407; *State* v. *Shettleworth*, 18 Minn. 208; *Jane* v. *Commonwealth*, 2 Met. (Ky.), 30; *State* v. *Oscar*, 7 Jones, 305; *Ray* v. *State*, 50 Ala. 104; *Bradley* v. *State*, 31 Ind. 492; *State* v. *Crawford*, 34 Mo. 200; *Fuller* v. *State*, 12 Ohio St. 433.

The Court erred in refusing to instruct the jury that if from the evidence and under the law as given them by the Court there arose in their minds, or in the minds of any one or more of them, a reasonable doubt as to the defendant's guilt, such one or more jurors should give the defendant the benefit of such doubt, and refuse to convict. *Fassinow* v. *State*, 89 Ind. 235; *Castle* v. *State*, 75 Ind. 147; *Clem* v. *State*, 42 Ind. 420; *State* v. *Witt*, 34 Kans. 488; *Stitz* v. *State*, 104 Ind. 145; *State* v. *Sloan*, 55 Ia. 220.

The Court erred in refusing to instruct the jury that the dying declarations of the deceased were not to be received with the same credit as though she had testified to the same under oath upon ex-

amination.    1 Greenl. Ev., § 156; *Jackson* v. *Kniffen*, 2 Johns. 31; *State* v. *Vansant*, 80 Mo. 67.

The Court erred in refusing to instruct the jury that the fact that the defendant had not testified as a witness was not to be taken into consideration by them in determining the question of his guilt, and that all inferences therefrom must be excluded from their minds.    1878 G. S. ch. 73, § 7; *Farrel* v. *People*, 133 Ill. 244; *People* v. *Tyler*, 36 Cal. 522; *People* v. *Brown*, 53 Cal. 66; *State* v. *Cameron*, 40 Vt. 555; *Commonwealth* v. *Scott*, 123 Mass. 239; *Commonwealth* v. *Harlow*, 110 Mass. 411.

*H. W. Childs*, Attorney General, and *George B. Edgerton*, his asstant, for the state.

The Penal Code was designed as a codification of the criminal law of the state.    Section 162 furnishes a complete definition of the crime for which the defendant was prosecuted.    It embodies all the legislature desired to enact upon the subject and is a complete revision of the law, and wholly supplants all of 1878 G. S. ch. 94, §§ 16, 17.    Penal Code, § 541, is a sweeping repeal of all of 1878 G. S. ch. 94, on this subject.    The revision of the pre-existing law, or the codification thereof, wholly supplants the former law.    All provisions thereof, whether or not embodied in the Code, are repealed. *People* v. *Carr*, 36 Hun, 488; *Prince* v. *Laurel*, 51 Md. 457; *Gorham* v. *Linckett*, 6 B. Mon. 146; *Rogers* v. *Watrous*, 8 Tex. 62; *Harold* v. *State*, 16 Tex. App. 157; *Barker* v. *Bell*, 46 Ala. 216; *Hartley* v. *Hartley*, 3 Met. (Ky.) 56; *Thorpe* v. *Schooling*, 7 Nev. 15; *Ellis* v. *Paige*, 1 Pick. 43; *Pingree* v. *Snell*, 42 Me. 53; *Brouddus* v. *Brouddus*, 10 Bush, 299; *Campbell* v. *Case*, 1 Dak. 17.

The jurors must have understood from the charge that each individual was to be convinced beyond a reasonable doubt; and that his judgment and conscience was to be satisfied to a moral certainty of the defendant's guilt.

The Court undoubtedly placed a proper construction upon 1878 G. S. ch. 73, § 7, in declining to comment on the failure of the defendant to testify.    A strict construction of the statute enjoins the Court to silence.    The California and Vermont authorities cited in

defendant's brief are of no value here, as the statutes involved in those cases were essentially different from our own in this respect.

Buck, J. The defendant was indicted by the grand jury of the county of Ramsey for the crime of manslaughter in the first degree, and the indictment accused him of having committed the crime as follows: That at the city of St. Paul, on the 15th day of December, 1892, he feloniously used and employed upon the body of one Helen Clayton, a woman then pregnant with child, a catheter, by forcing and thrusting the same into the body and womb of said Helen Clayton, with intent then and there had and entertained by defendant to produce a miscarriage of said Helen Clayton, the use of said instrument, and the procuring of said miscarriage, or either of them, not being necessary to preserve the life of said Helen Clayton, or the life of the child with which the said Helen Clayton was then and there pregnant, and that said defendant did then and there inflict upon the body of said Helen Clayton mortal bruises and injuries, of which she died December 22, 1892.

Upon the trial, the defendant was found guilty of the crime charged in the indictment. The defendant moved for a new trial, and the same was denied by the trial court; and thereupon he appealed to this court, and, in his notice of appeal, he states that the appeal is taken from the order denying the motion for a new trial, and "from the judgment of said court entered in said cause on the 1st day of April, 1893."

The defendant, in his assignments of error, twelve in number, alleges various grounds upon which he claims the trial court erred, and upon which he claims that a new trial should be granted. Most of these assignments of error are obviously without merit, and, while we have carefully examined all of them, we shall not discuss them at length. It is claimed that there is no corroborative evidence as to the commission of the offense and the identity of the defendant, as required by law. Upon the trial, the evidence tended strongly to sustain the charge in the indictment, and the jury must have found the charge true.

Helen Clayton was a married woman, and her husband, Stephen D. Clayton, who participated in the commission of the alleged offense,

was a witness in behalf of the state, and testified that he was present when the crime was committed, and to seeing and knowing many of the facts in the case. That his own conduct, in the part he took, in the whole transaction, which resulted in the death of his wife, made him an accomplice in the crime, seems unquestionable, although he does not appear to have been a willing participant in the commission of the offense. The wife, Helen Clayton, says, in her dying declarations, that it was her fault and the doctor's, meaning, as we understand it, the defendant. She was pregnant with child, and, desiring to have an operation performed upon her, she and her husband went to the defendant, who was a physician, and requested him to produce an abortion or miscarriage upon the wife, which the defendant undertook to do for a money consideration, but the operation resulted in her death. But, however unwilling the husband might have been to have this operation performed upon his wife by the defendant, yet, yielding to the wish of the wife, and evidently overpersuaded by her entreaties and wishes, he must stand and be treated in law as an accomplice. It is the law of this state that a "conviction cannot be had upon the testimony of an accomplice, unless he is corroborated by such other evidence as tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense, or circumstances thereof." 1878 G. S. ch. 73, § 104. The dying declarations of the wife, Helen Clayton, were admitted in evidence by the trial court, to corroborate the evidence of her husband. As a first impression, it may seem to be an unsound rule that one who solicits the commission of an offense, and willingly submits to its being committed upon her own person, should not be deemed an accomplice, while those whom she has thus solicited should be deemed principal criminals in the transaction. But in cases of this kind the public welfare demands the application of this rule, and its exception from the general rule seems to be justified by the wisdom of experience. The wife, then, in this case, was not, within the rules of the law, an accomplice. She was the victim of the cruel act which resulted in her death. Misguided by her own desires, and mistaken in her belief, she, by the advice of the defendant, submitted to his treatment, willingly, it may be; but the desire of one,

and the criminal act of the other, resulted in the death of one, and the imprisonment of the other. That the wife in such cases is not to be deemed an accomplice, we cite the following cases: *State* v. *Owens,* 22 Minn. 238; *Dunn* v. *People,* 29 N. Y. 523; *Commonwealth* v. *Wood,* 11 Gray, 85.

The wife, then, not being an accomplice, we are to consider the tenth assignment of error, viz. that the court erred in refusing to instruct the jury "that the declarations of the deceased are not to be received with the same credit as though she had testified to the same under oath, upon examination." This request must be considered in connection with the instruction actually given to the jury by the trial court, viz.: "Such declarations are admitted only when made under a belief on the declarant's part of impending death, and because, as it is reasoned, that one so situated will speak the truth as fully as under oath and on the witness stand. * * * Any declaration made by Mrs. Clayton, and testified to by Mrs. Wrede, if the jury believe the declarant stated the truth, tending to show that a criminal abortion had been committed upon her, and that the defendant committed it, should be given its just weight by the jury. And I instruct you further that, if you believe that Helen Clayton made to Mrs. Wrede the dying declarations testified to by Mrs. Wrede, you should consider them in connection with all the other proven facts and circumstances of the case, and give them the weight which, under the circumstances, they deserve. On the other hand, if you find from the evidence that these declarations, though made, are not true, or that they are contradicted in material particulars and discredited in any way, you should then disregard them, but you cannot justly or rightfully reject this or any other credible and unimpeached testimony without some reason for so doing." We are of the opinion that this was a fair and correct statement of the law, taken altogether. Dying declarations are necessarily admitted in cases of homicide, and especially in cases like this, where manslaughter is the gravamen of the crime alleged. Such evidence may result in wrong sometimes, but its absolute necessity is now universally recognized. It may be that some men do go down to death with a lie upon their lips, and that their last utterances are full of falsehood, but such cases are exceptions to the

general rule, and do not furnish a proper ground for the rejection of dying declarations as evidence, when offered within the ordinary rules upon the subject, any more than it would be proper to exclude any testimony because some witnesses perjure themselves when testifying under oath. While the text writers sometimes speak of the weakness of evidence of dying declarations, because of the want of an opportunity for cross-examination, they still lay down the rule that such admissions are fully satisfied if the declarant is shown to be conscious of the fact that he is in a dying condition. 1 Taylor, Ev. 625, quotes Lord Chief Baron Eyre as saying "that such declarations are made in extremity when the party is at the point of death, and when every hope of this world is gone, when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice."

And Taylor, in his work on Evidence, (volume 1, p. 628, § 717,) lays down the rule as follows: "The persons whose declarations are thus admitted are considered as standing in the same situation as if they were sworn, the danger of impending death being equivalent to the sanction of an oath."

Greenleaf on Evidence (volume 1, § 147) lays down the rule as follows: "The persons whose declarations are thus admitted are considered as standing in the same situation as if they were sworn, the danger of impending death being equivalent to the sanction of an oath." We have examined the authorities cited by the defendant's counsel in support of the position which he assumes, but we do not feel disposed to follow them. The court below explicitly stated to the jury that the weight of the dying declarations as evidence was for them to determine. These dying declarations, when introduced on the trial, did not contain any evidence of the cross-examination of the deceased, and this fact was patent to the jury, and they were at liberty to give such declarations their due consideration. Whether they should be given the same credit as would have been given to them if she had testified as a witness under oath upon the stand was a question for the jury, and not for the court. If the in-

struction had been given as requested, the court, in some degree at least, would have been assuming the province of the jury,—a proceeding which should not be permitted, but should be strongly guarded against. When a court, in such cases, assumes to determine for the jury the degree or amount of credit which should be given to the evidence, it is passing the danger line, and trenching upon the general and well-settled rules of evidence in criminal cases; in other words, it is substituting its own views of the evidence as to its credit and weight in the place of that of the jury. The trial court was careful that the proper foundation was first laid for the admission of these dying declarations, which were evidently made under a full apprehension, at the time, of impending death; and that death ensued is not questioned.

Some of her dying declarations, as testified to by Mrs. Wrede, and admitted as evidence, were as follows: "She spoke about home and mother, and she says: 'I am afraid I shall never see poor mother again.' Then she says: 'You take me home with you, Sophie, won't you?' I said: 'Yes;' as soon as she was able to travel, I would take her home, and she could mend while she was in my house. Then she says: 'I don't mean it that way. I mean death, for I feel that I am going to die. He has finished me. He has killed me. And you don't know how I suffer.' I says, 'Who?' She says, 'Dr. Pearce.' Then she told me she went and had an operation performed by Dr. Pearce, which was very painful. She said: 'He encouraged me, and promised no harm would come of it. Instead, he hurt me dreadful.' She said: 'He cut and tore me, and I suffer dreadful. If he had discouraged me, I should never have done what I did.'" This evidence, together with other evidence upon the subject appearing in the record, brings the case within the rule, so frequently stated in the books, that dying declarations are admissible where the death of the deceased is the subject of the charge, and the circumstances of the death the subject of the dying declarations.

In this case the subject of the charge is the death of Helen Clayton, and the circumstances of the death the subject of the dying declarations. Death resulted from the attempt of the defendant to produce an abortion or miscarriage on the person of Helen Clayton, and her death was the subject of the inquiry. It was not simply an inquiry or proceeding to punish the defendant for producing an abor-

tion upon Helen Clayton, but an inquiry as to the cause of her death. The defendant was convicted, not merely of abortion, but of causing the death of Helen Clayton, through the instrumentalities used in attempting to produce abortion, the commission of which offense our statute denominates and punishes as "manslaughter." The gravamen of the charge was manslaughter, or the death of Helen Clayton. It was her death which was a necessary ingredient of the offense to make the dying declarations admissible. The indictment was based upon this fact, and the trial was had accordingly. It is a fact worthy of being mentioned here that it does not appear that these dying declarations were made by the deceased with any knowledge or expectation that they would, or even could, be used in a criminal prosecution against the defendant. Such being the case, the infirmity that sometimes is attributed to this kind of evidence because the declarant might have felt a resentment, and wished the defendant punished, and made her dying declaration accordingly, is wanting. She felt that her own life was about to end, and, while nearly in the very presence of death, she was begging of her sister to take her home to her mother, and she exclaimed, "I feel that I am going to die." There was no inducement for her to utter a falsehood. It was the simple statement, to a loving and watchful sister, made by her as she was about to go down to an untimely grave; and, if such testimony is not entitled to be submitted to a jury as to its weight and credit, in comparison with what her testimony might have been if a witness upon the stand, then we fail to understand what constitutes legitimate evidence. It would often result in a perversion of legal justice if such evidence could not be admitted in such criminal proceedings, especially as crimes of this character are usually committed in secret.

The eleventh assignment of error is as follows: That "the court erred in refusing to instruct the jury: 'That defendant has not testified in this case cannot be taken into consideration by you in determining the guilt or innocence of the defendant, and all reference thereto, and inference therefrom, must be entirely excluded from your minds, and your determination must be based solely upon the evidence introduced and the instruction of the court.'" We are of the opinion that no serious question can arise upon the refusal of the court to give this instruction, and that the court was clearly

right in this respect; yet, in view of the fact that this is a criminal case, we will not dismiss the matter summarily without any further discussion. We are not unmindful of the fact that in criminal proceeding there should be a cautious regard for the rights of the defendant, as well as a careful consideration of the rights of the public.

In cases involving the life or liberty of a human being, there is always a grave responsibility necessarily resting upon courts, as well as upon persons engaged in the trial. The pernicious consequences of the illegal administration of the criminal law are too apparent to need much discussion. But, studiously and sacredly as courts may seek to have criminal trials and proceedings conducted according to the law, they cannot defy the well-settled definitions of words, or nullify the well-understood grammatical construction of sentences or provisions of our statutory law. If we bend the law for one case to-day, we may be called upon to break it for another to-morrow, and the obvious result will be confusion and uncertainty, perhaps imperiling or destroying the liberty or life of the individual.

Now, what are we called upon by the defendant to do? To wrench a statutory law from its true meaning, to violate the legislative will, and to say that, when a legislative enactment prohibits a trial court from alluding to or commenting upon the neglect or refusal of a defendant to testify in his own behalf, still it is the duty of such court to comment upon and allude to such fact, and to instruct the jury that they shall not consider certain acts, and must exclude certain inferences from their minds. If there were doubts in our minds, we might construe the law liberally, but there is no room for doubt. Let us quote the law, which is as follows: "On the trial of all indictments, complaints, and other proceedings against persons charged with the commission of crimes or offenses, the person so charged shall, at his request, but not otherwise, be deemed a competent witness; nor shall the neglect or refusal to testify create any presumption against the defendant, nor shall such neglect be alluded to or commented upon by the prosecuting attorney or by the court." 1878 G. S. ch. 73, § 7.

Is not this law plain, clear, certain, definite, and easily understood? It would be a great judicial feat for the trial court to instruct a jury

in regard to the effect of this law without alluding to it. Webster's definition of the word "allude" is "to refer to something not directly mentioned; to have reference; to hint at by remote suggestions." The trial court is therefore forbidden to hint at the existence of such a law, even by a remote suggestion. It has not the right to allude to it or comment upon it. There is a well-known constitutional guaranty that a defendant shall not be compelled in any criminal case to be a witness against himself, but he can waive this privilege if he chooses so to do. The statute upon this subject was passed for his benefit. The question of its wisdom does not concern this court in the present case. It exists,—the result, no doubt, of the more humane spirit of the age,—and is intended to benefit the innocent person unfortunately charged with the commission of a crime.

But the question of the defendant's testifying in his own behalf is left to his own discretion. If a sense of embarrassment, and the fear of attending perplexities and dangers, present themselves to him, he can remain silent. Neither the court nor prosecuting attorney can comment upon or allude to this fact, but what a jury may think or determine from this silence is beyond the control of courts or attorneys. They are presumed to know the law, and to act truly upon the evidence. However much the neglect of the defendant to testify in his own behalf may militate against him, that is not the fault of the law, but a matter within his own control. If he feels that he is innocent, and is willing to have the question of that innocence tested by the aid of his own testimony, there is no legal barrier to his going upon the witness stand and telling of that innocence. There the crucial test of innocence or guilt may be weighed and determined. If he is innocent, can he not ordinarily explain or deny the charge or evidence given against him? Will truth suffer in such a contest more than it would if the defendant is silent, in case he knows that he is innocent? Silence may be ominous of guilt, but who can dispel the probability of a dangerous result better than the defendant himself? Why should he not utter the truth, when his own life or liberty may be at stake, when his own reputation is involved, and when public interest would be better subserved by such utterance than by his silence?

In one of the cases cited by the defendant, viz. *State* v. *Cleaves*, 59

Me. 298, we find this language used by the court: "The embarrassment of the prisoner, if embarrassed, is the result of his own previous misconduct, not of the law. If innocent, he will regard the privilege of testifying as a boon justly conceded. If guilty, it is optional with the accused to testify or not, and he cannot complain of the election he may make. If he does not avail himself of the privilege of contradiction or explanation, it is his fault if by his own misconduct or crime he has placed himself in such a situation that he prefers any inferences which may be drawn from his refusal to testify to those which must be drawn from his testimony, if truly delivered." This decision is certainly in direct conflict with the contention of the defendant. Nor has the defendant cited any case that is precisely in point. We have carefully examined the statutes of the different states where decisions have been made upon this question, but they are different from the law of this state. The only state which has a law in some respects resembling our own which we have been able to find is that of Illinois, and as the defendant claims that it is identical with our own, and as he places great stress upon the case of *Farrell* v. *People*, 133 Ill. 244, (24 N. E. 423,) where the statute of that state is construed by the court of Illinois, we quote the law itself, which is as follows: "A defendant in a criminal case or proceeding shall at his own request be deemed a competent witness, and his neglect to testify shall not create any presumption against him, nor shall the court permit any reference or comment to be made to or upon such neglect." In the case above cited, the syllabus is as follows: "When defendant does not testify, it is reversible error to refuse to instruct the jury that no presumption of guilt should be indulged against him on that account,"—citing above statute. There were two defendants in that case, viz. Farrell and Norton, and Norton testified upon the trial in his own behalf, but Farrell did not. The trial court instructed the jury as to the weight to be given to Norton's testimony, by which the attention of the jury was directed to the statute making defendants in criminal trials competent to testify in their own behalf, and this seems to have been the reason given by the supreme court of Illinois for its decision above quoted, as no other reason is given. But the language of the law of Illinois is materially different from the law of this state

upon the question of a defendant's testifying in his own behalf on a criminal trial. There the court cannot permit any reference or comment to be made to or upon the subject of such neglect. This grants to the court the power to stop any attorney in the case from criticising or commenting upon such neglect. The court itself is not forbidden to refer to or comment upon the subject, but it has the power to prevent others from doing so. Our law upon the subject goes much further, and prohibits not only the prosecuting attorney, but forbids even the trial court, from alluding to or commenting upon the neglect or refusal of the defendant to testify. The distinction between the two laws is very apparent. The statute law of the state of New York upon this question is as follows: "The neglect or refusal of any such person to testify shall not create any presumption against him." Yet the court of appeals of that state, in *Ruloff* v. *People*, 45 N. Y. 213, state the law upon the subject as follows: "Neither the prosecuting officer nor the judge has the right to allude to the fact that a person has not availed himself of this statute, and it would be the duty of the court promptly to interrupt a prosecuting counsel who should so far forget himself and the duties of his office as to make use of the fact in any way to the prejudice of a person on trial. An allusion by the judge to the fact, unexplained, cannot but be prejudicial to a person on trial, and a provision intended for his benefit will prove a trap and a snare. It is an intimation to the jury of the effect upon his mind of the omission of the accused to explain, by his own oath, suspicious and doubtful facts and circumstances, as affecting the question of guilt or innocence." It is even doubtful, if the instruction requested had been given, whether it would not have been more injurious than beneficial to the defendant, for the minds of the jury would have been drawn directly to the defendant's right to testify in his own behalf, but that he had neglected so to do, notwithstanding his right and competency to take the witness stand in his own behalf. There was no error on the part of the trial court in refusing the instruction requested.

No errors appearing in the record, the order denying the motion for a new trial, and the judgment appealed from, are affirmed.

(Opinion published 55 N. W. Rep. 652.)

ON APPLICATION FOR REARGUMENT.

January 31, 1894.

By the Court. The application for a reargument is denied. But as defendant's counsel thinks we have misapprehended some of his points, and overlooked others, we deem it proper, in view of the nature of the case to add:

1. That we meant to hold, and supposed that we had made our meaning sufficiently clear, that while the defendant could not be convicted upon the uncorroborated evidence of the woman, nor upon the uncorroborated evidence of her husband, yet he might be convicted on the evidence of the two, each corroborating the other; the woman not being an accomplice in the commission of the crime.

2. The court's definition of a "reasonable doubt," taken as a whole, was correct; and that part excepted to was in the form impliedly approved by this court in *State* v. *Dineen,* 10 Minn. 407, (Gil. 325.)

3. The court, in its charge,—which is addressed to each juror individually, to guide his action,—having instructed the jury that if they did not feel convinced, beyond a reasonable doubt, that all the material allegations of the indictment had been established, they must find the defendant not guilty, it was not error to refuse to charge that, "if any one or more" of them did not feel thus convinced, then such one or more of them should find for the defendant.

(Opinion published 57 N. W. Rep. 1065.)