EVERETT EDWARDS V. STATE OF NEBRASKA.

FILED JUNE 7, 1907.   No. 14,988.

1. Abortion: WORDS DEFINED.  The words, "at any stage of utero-gestation" as used in section 6 of the criminal code, defined, and *held* to mean "at any stage of pregnancy."

2. ———: EVIDENCE: DYING DECLARATIONS.  In a prosecution for homicide in procuring an abortion under section 6 of the criminal code, dying declarations of the deceased may be admitted in evidence, under the same conditions and limitations as in prosecutions for murder or manslaughter.

ERROR to the district court for Buffalo county: BRUNO O. HOSTETLER, JUDGE.  *Affirmed.*

*C. A. Robinson* and *Harrison & Prince,* for plaintiff in error.

*W. T. Thompson, Attorney General,* and *Grant G. Martin, contra.*

LETTON, J.

The defendant was convicted in the district court for Buffalo county of homicide by the use of instruments used in attempting to procure an abortion.  He seeks a reversal of the judgment of conviction upon two grounds: First, that the information was fatally defective in that it does not charge that the abortion was committed during the period of utero-gestation; and second, because the court erred in admitting in evidence the dying declarations of the deceased.    The first contention is based upon the fact that the language of section 6 of the criminal code under which the charge is made is as follows: "Any physician or other person who shall administer, or advise to be administered to any pregnant woman with a vitalized embryo, or fœtus, at any state of utero-gestation, any medicine," etc.   It is urged that the term "utero-gestation" is not synonymous with "pregnancy," that there may be gestation in the fallopian tube and hence that the allega-

tion is essential. We think, however, that the use of the words "at any stage of utero-gestation," in the statute, means at any stage of pregnancy. At common law it was thought that a person could not be guilty of abortion unless the pregnant woman was quick with child. The clause here considered was evidently inserted in the statute to avoid the perplexing and doubtful questions which might be raised as to the time of "quickening" under this view of the law. One of the definitions of the word utero-gestation given by the Standard dictionary, by the Century dictionary, and by Webster, is "pregnancy," and this is the sense in which it is used in this connection. We think therefore that the indictment was not defective for the lack of such allegation.

The second point made by the defendant is that the court erred in admitting the dying declarations of Anna Gosch, as related by her attending physician, Dr. Cameron. It is said that this evidence is inadmissible for two reasons: Because it is not competent under the charge in this case, and because no sufficient foundation was laid for its introduction.

For convenience, we will consider the second of these objections first. It is said that Miss Gosch was under the influence of opiates when she made the statements; that the declarations were made on Monday; that she died on Tuesday at 6:10 P. M., and that she is not shown to have given up hope or to have been in fear of immediate death. It appears from the evidence that the attending physician was called upon Thursday, the 15th day of March; that he visited her that day and twice a day thereafter until Monday; that on Monday afternoon, about 2 or 3 o'clock, after an examination and consultation with another physician who had been called for the purpose, he told her that she was going to die. The witness was asked by the court: "Q. What did she say when you told her she was going to die, with reference to her dying? A. I think she cried some, and asked me if there was anything more that could be done, if I remember right. Q. What did you

say? A. I told her no; that anything I could do would make her worse." The witness testifies that her mind was clear at the time he had this talk with her, and that she answered questions rationally. The patient had been suffering severely for several days. A consultation of physicians had been had, and the result of the consultation had just been told her. She showed a realization of the solemn fact that had just been communicated, and, upon asking if anything more could be done, was again told her case was hopeless. It seems clear that the statements which were immediately thereafter made to the doctor were made with the knowledge and realization of impending death, and that the fact that she survived until the next evening is of no importance. The doctor continues: "A. I asked her what had been done to make her sick, and she said there had been a man had passed an instrument into her with a wire in it, rubber with a wire in it. I asked her when that had been done, and she said Monday; she thought it was Monday night. Q. What further was said? A. I told her then if she had told me that on the start that I might have done something for her, but anything I would do at this time would only help to make her worse. Q. Did she say who the man was that did this? A. She said he was a man who traveled for rubber goods or instruments of some kind, said he was a traveling man. Q. What further did she say about it, if anything? A. I asked her if she was willing to have that done. She said no; that he made her do it. That is about all that was said then. I left the room then." It is urged that these statements condemn by suggestion and inference. That no person was named, and that they might have been made to protect her own name and excuse herself by throwing the blame on some unknown person. It is true that no person was named, but an individual was described, and the time and manner of the unlawful act was narrated. The jury were entitled to consider the declarations in connection with the other evidence in determining the identity of the guilty individual, and the cause of death.

The defendant's second contention is that the dying declarations were not competent evidence, for the reason that this is a prosecution for procuring an abortion, and the death of the deceased is not the subject of the charge; that the death of the woman in such a case as this is only incidentally involved and is not the gravamen of the offense. Some text-writers, but not all, lay down this rule, and there seems to be a substantial conflict in the decisions of the courts with reference to whether or not dying declarations are admissible in cases of this nature. The conflict, however, seems to be more apparent than real, depending largely upon the particular language used in the different statutes relating to the offense of procuring an abortion or of causing death while in the commission of an abortion. The earlier cases seem to adhere to the rule stated, and the later to take the opposite view. The fundamental distinction between the cases, or at least between those which are best considered, is that under one class of statutes the offense is punishable whether death occurs or not, and in the other class the crime defined is not committed unless death ensues as a result of the operation. The section under which the conviction was had in this case appears as section 6, ch. 2, of the criminal code. The act establishing a criminal code was enacted as a whole, with the various subjects of which it treats classified and subdivided into chapters at the time of its enactment. Chapter 2 is entitled "Homicide and Fœticide," and consists of four sections; sections 3, 4, 5 and 6, defining, respectively, the crimes of murder in the first degree, murder in the second degree, manslaughter, and fœticide and homicide in committing the same. Chapter 6 of the criminal code is entitled, "Attempts and Inducements to Poisoning and Abortion," and under this chapter is found section 39, which provides in substance for the punishment of any person who shall attempt unlawfully to procure an abortion by the use of drugs or instruments.

So far as the intention of the legislature may be gathered

from the manner of classification and the context of these sections of the statute, the administering of drugs or other substance, or the using of instruments with the intent to procure an unlawful miscarriage, falls under one class of offenses, while causing death by the use of such methods falls under another. Under section 39 the unlawful use of instrumentalities to procure a miscarriage is the gist of the offense and the subject of the charge, while under section 6 no punishment is provided unless in case of the death, either of the vitalized embryo, or fœtus, or mother, so that death is the subject matter with which this section is concerned, and causing death is the crime denounced thereby. If the legislature had provided that in case of the death of the vitalized embryo or fœtus, or mother, the guilty person should be deemed guilty of manslaughter and imprisoned in the penitentiary, this would not make death any more the subject of the inquiry than it is as the section now stands. This is what was actually done in the case of section 93 of the criminal code, where a punishment is provided for interfering with railroad tracks or bridges, or placing obstructions upon the rails, and it is provided that, if any person dies from the result of such acts, the guilty person shall be deemed guilty of murder in the first degree or second degree, or manslaughter, according to the nature of the offense. In the case of train wrecking, as in the case of using instruments or drugs to procure an abortion, there is a special statute concerned with the manner of procuring death or the instruments by which it is caused, and a punishment provided in the event that death ensues from the wrongful act. Causing the death in both instances is the subject matter of the sections which provide for punishment in the case of death, and in charges brought under such provisions death is clearly the subject of the charge. *Davis v. State,* 51 Neb. 301; *People v. Commonwealth,* 87 Ky. 487. The defendant insists that our statute is copied almost verbatim from the laws of Ohio, and that that state has decided that **dying** declarations are not admissible in proceedings

brought under this section. In that state, at the time of the decision cited, there was a separate act covering the crime of abortion, the second section of which is almost identical with the section under consideration. In *State v. Barker*, 28 Ohio St. 583, the defendant was indicted for manslaughter while in the commission of an unlawful act by using certain means with the intent to procure an abortion. The court held that, if the cause had proceeded to trial and the evidence shown that the death of the woman was occasioned by using instruments to produce an abortion, there could have been no conviction for manslaughter, because the evidence showed that another crime had been committed for which there was a separate and specific punishment, but held, further, that the indictment did not show all the elements of the crime under the abortion act, and therefore the indictment was good. In a later Ohio case, *State v. Harper*, 35 Ohio St. 78, the defendant was indicted under the abortion act, the first count charging the unlawful use of an instrument with intent to produce an abortion and the consequent destruction of the vitalized embryo, and the second count charging that by the use of an instrument with the same intent the death of the mother was caused. On the trial the state attempted to prove the dying declarations of the mother, which were excluded by the court. In the opinion of the supreme court it is said: "This was an indictment for unlawfully using an instrument with the intent of producing an abortion, and not an indictment for homicide. * * * The death of R. G. was not the subject of the charge and the death was alleged only as a consequence of the illegal act charged, which latter was the only subject of investigation." This is all that was said upon the question. The question under investigation is therefore decided, but not discussed, in this opinion. It may be said further, that, since this consideration of the statute was made by the supreme court of Ohio several years after the adoption of our criminal code, the rule that, where we adopt a statute from another state, we also adopt

the construction placed upon the statute by the courts of that state, does not apply. Moreover, as we have seen, when the section was adopted in substance in this state, the crime was classified as a species of homicide. In our opinion, there seems to be no sound reason for the rule in such a case as this under a statute such as ours.

While the statutes in the following states are not identical in language with that of this state, nor with those of each other, their highest courts have held such declarations admissible in cases of prosecution for death caused by the use of means to procure unlawful abortion, and we prefer to adopt such rule. The states whose courts take this view are Indiana, Wisconsin, Minnesota, Michigan, Iowa, Kentucky and New Jersey. *State v. Pearce,* 56 Minn. 226; *Montgomery v. State,* 80 Ind. 338; *State v. Baldwin,* 79 Ia. 714; *State v. Leeper,* 70 Ia. 748; *State v. Dickinson,* 41 Wis. 299; *People v. Commonwealth,* 87 Ky. 487; *People v. Lonsdale,* 122 Mich. 388; 1 Elliott, Evidence, sec. 353. In a New Jersey case, *State v. Meyer,* 64 N. J. Law, 382, it was held that dying declarations in a case where the defendant was charged with using an instrument upon the person of a pregnant woman with the intent to cause a miscarriage were inadmissible, but the reason given by the court for this conclusion was that, as the statute then stood—it having recently been changed —death was no longer an essential element of the crime, and therefore the dying declarations of the deceased were inadmissible.

A consideration of the reason for the rule admitting dying declarations shows that there is no logical ground for the distinction which has been attempted to be drawn with reference to their admissibility. The two reasons upon which the rule rests are: On account of necessity, since in many cases the first clue to the person guilty of the homicide is procured by the dying declaration of the wounded person, and often, but for this evidence, justice would miscarry and guilt go unpunished; and, second,

20

because in the near approach of death and in the thought of dissolution, all temptations to falsify or motives to tell other than the truth are removed from the mind, and the solemnity of the occasion supplies a sanction equal to that of an oath. These being the grounds upon which the rule of admissibility rests, the necessity is just as urgent and the solemnity of the occasion just as great in a case where a woman is dying from the result of an unlawful operation, as if she were in the same condition as the result of the commission of any other unlawful act, such as from an assault made by a burglar while committing burglary, or by a robber in the act of robbery.

Aside from the dying declarations, it would seem as if there was sufficient evidence to convict the defendant. The evidence is uncontradicted that he admitted to the sheriff and to the county attorney that he had become acquainted with the deceased, had kept company with her to some extent, and had upon several occasions shortly before the act of abortion had sexual intercourse with her; that she had called him by telephone while he was at a neighboring town, and informed him that her menstrual period had passed and that she was worried about it; that he then went to Kearney, procured a room in a hotel, and took her there with the intention of procuring an abortion by the insertion of instruments; that while in the room for this purpose they were disturbed by a bell boy sent by the proprietor of the hotel, who objected to the defendant taking a woman to his room; that the next day he went to her home, and took with him a speculum and some catheters for the purpose of performing the operation; that he attempted to insert a catheter for some time, but failed, and that afterwards the deceased went up stairs, and returned with a small catheter with a wire in it, and that he used it, and afterwards bent the wire and threw it away. Upon cross-examination, however, this witness stated that the defendant at the time he made these admissions denied having accomplished the abortion himself, but stated that the deceased woman,

when she came down stairs, said that "she thought she had done it." The evidence also shows that a speculum and three catheters were found in his valise when he was arrested, and that he had these articles in his possession at about the time of the unlawful act. The only question upon which there seems to be any doubt is whether the actual insertion of the catheter into the womb was performed by the defendant himself or by the deceased under his suggestion, advice, and procurement, and following his unsuccessful efforts to obtain the same result. Taking these admissions in connection with the other evidence in the case, it would seem that the verdict had sufficient evidence to support it, even if the dying declarations had been excluded.

The judgment of the district court is

AFFIRMED.