GEORGE F. PIERCY v. STATE OF NEBRASKA.

293 N. W. 99

FILED JUNE 21, 1940. No. 30883.

*Arthur E. Perry, Perry, Van Pelt & Marti* and *J. W. Boyd,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Rush C. Clarke, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

PAINE, J.

Defendant was convicted of criminal abortion by use of instruments which caused the death of the embryo, or fœtus, as a direct consequence of an unlawful operation.

Motion for new trial being overruled, the defendant was sentenced to the penitentiary for a period of not less than one year or more than three years, and now prosecutes error to this court.

This prosecution of George F. Piercy was founded on an information, the first count of which charged him with having employed upon the womb of Pauline Killough, then pregnant with a vitalized embryo, or fœtus, a certain metallic instrument and a rubber tube, or catheter, and thrust said instrument into her womb, with intent to destroy the fœtus, thereby causing the death of said Pauline Killough, such instrumentation not being necessary to preserve life, and not having been advised by two physicians, as necessary for such purpose. The second count of the information charged the defendant with performing the same operation, using the same instruments, and thereby causing the death of the embryo, or fœtus, as a direct consequence of such unlawful operation. Trial of the case began October 30, 1939, the jury taking the case on the fourth day. The jury remained out for a little over two days, and returned

a verdict of not guilty on the first count, but guilty on the second count.

The defendant's first error alleges that the verdict was contrary to the evidence, and not supported by any competent evidence which requires an examination of the testimony.

The state's evidence tended to prove that Pauline Killough was 17 years of age, and lived with her parents on their farm nine miles north and two miles east of Guide Rock, in Webster county. The family consisted of five daughters and two sons, two of the girls being married and living near Superior. Pauline had always lived at home, except parts of two years when she went to the Superior high school. A young man named Chester Skeers had kept company with her, and she went out with him in February, 1939. Her health was good, and on Wednesday, April 12, 1939, she worked about home, helping paper the kitchen, and in the evening Chester Skeers took her out in a car, and she did not return until late that night. The next day she could not work, but laid around, seemed sick, and by Sunday had become quite sick. The following Thursday, April 20, the mother could smell a bad odor about the girl, she had a temperature, and on Saturday commenced vomiting, and during the night kept getting worse. She had told her mother the cause of her condition, but told her not to tell her father, but about 1:30 Sunday morning, April 23, she told her mother to tell her father, because she was not "going to get over this" anyway. The girl then made a statement to her father, and on Sunday was put in a car and taken to the residence of Dr. W. E. Florea, and the same afternoon entered the Superior hospital, after Drs. Florea and Gartrell had secured a statement, signed by the girl, telling of her condition and its cause, before they would take over her case. She died the next day, Monday, April 24, and an autopsy was performed April 26, four doctors being present and signing the report, which contained these two statements, among others: "Block findings were: a. Inside the uterus we found placental remnants. b. Right

Fallopian Tube infected and perforated. It was enlarged and necrotic."

Dr. J. E. Ingram, a graduate of the Cincinnati Medical School, who had practiced 16 years at Nelson, was present at the autopsy. He testified that the presence of placenta, or afterbirth tissue, in the uterus proved that pregnancy had taken place. He said he saw one shred which was about an inch and a half long, and still attached to the uterus; there was another fragment that was loose, discolored, and had decomposed.

Chester Skeers was called by the state, and testified that he was 22 years of age, lived at Mankato, Kansas, had known Pauline Killough about four years before her death, and had kept company with her once in a while; that he took her to Guide Rock in February to a show, and later in February met her at a dance at Bostwick, from which he took her down to his home, where she stayed all night, and his sister and mother went with him when he took her back to her home on Sunday. In April she wrote him a letter and told him she wanted him to come and see her, and he got her at her home on Wednesday, April 12, about 8:30 in the evening. She was dressed in slacks, and they drove to Superior, and parked the car in front of the second -door south of the Nebraska Hotel, and he left her in the car and went into the office to see the defendant, Dr. Piercy, and told him he had a woman out there, and he wanted him to examine her; that "she said she was in the family way," and told the doctor that "she said I was the cause of it," and that the defendant said he "didn't like to do that very well," that it would "get us in bad," but said it would cost $15. Witness told him he only had $5, but would get the rest as soon as he could.

Pauline then came into the office, and went into the back room. She said she was pregnant, and defendant told her to get up on the table, after she took her slacks off. Skeers then described briefly about the defendant taking off her bloomers, putting on a rubber glove, putting a clamp in her private parts, taking a long instrument, that looked

like shears, and putting cotton on the end of it, and inserting it in her private parts, and then putting in a little long rubber tube, six or eight inches long, and told her to leave the tube and gauze in there three or four days. Witness identified exhibit No. 6 as the tube, with gauze attached. He said the doctor told her to be sure and not tell anybody about that. Witness said he had had sexual relations with Pauline in February. Witness testified that he was present in Dr. Piercy's office all the time Pauline was there, and close enough so he could hear all that was going on.

The defendant, George F. Piercy, testified that he was 61 years of age, had lived in Superior 25 years, was a graduate of the Kirksville College, and said that his record of the date of this occurrence was April 10. He denied that he performed an abortion upon her on this occasion; said he never saw her after that evening when she was brought to his office about 9 o'clock; that she did not give her name; that a young man was with her, who said they were from Mankato. He said the young man had called him over the telephone about 15 minutes before, and asked if he could come down to the office, and he went right down; that the young man said: " 'Well, Doc, I am in an awful jam.' I said, 'Well, what's the jam?' Well, he said he got married three or four weeks ago and now a girl was accusing him of getting her pregnant, and he says, 'I wondered if you would examine her.' Well, I said, 'I can examine her; yes, I can examine her,' I said, 'I will do that.' " The young man then went out and came back with the girl, and she did not say anything, but just followed back to the "treating" room.

The defendant testified in the minutest detail as to all that he did after she was placed on the "treating" table. He used a sterilized rubber glove, and made a digital examination, then used his vaginal speculum, then took his uterine dressing forceps, and placed a pledget of cotton saturated with an antiseptic solution, and started to clean out the pus and mucus, and had the speculum and forceps in court to show the jury; said he inserted the forceps prob-

ably five times in the vagina; that he took a specimen of the pus with a wooden applicator, and put it on a glass slide, which he had in court, and testified that the next morning he stained it and examined it under the microscope. Defendant testified he told them she had a bad infection, and that there were three or four small red spots around the opening of the womb, which had been punctured, and he said he suspected she had been tampered with, and he asked her if she had, and she hesitated and then finally mumbled no. The defendant testified that he put in a tampon, being a piece of gauze with a string tied around it, and saturated with medication made from Zylol tablets and alcohol, a sample of which gauze and tablets he exhibited to the jury, and he instructed her to take the tampon out the next day, and to go and see her local physician, as she had a bad infection. Defendant testified that he had no way of knowing whether she was pregnant or not, but that he gave her some Acetanilin tablets if needed for pain, and due to the fact that it seemed to be a case of delayed menses he gave her a few Emmenagogue tablets, which help to regulate the menses. His attention was called to exhibit No. 6, being part of a catheter, a rubber tube, which had been received in evidence, and he denied that he had ever inserted that into the sexual organs of Pauline Killough, or that he had ever seen it before, and denied that he had any such rubber tubes in his office, and positively denied that he had inserted any instrument in the uterus at the time of his treatment, for which he said he charged and received five dollars.

On rebuttal, Chester Skeers denied he told defendant on the night of April 12 that he was a married man, but said he told him he was going to be married, and that he was married at Beloit, Kansas, on July 23.

Defendant devotes much of his argument to a discussion of the alleged prejudicial error in the admission of the dying declaration. This 17-year-old girl had been rapidly getting worse for about ten days after the operation; she had a high temperature, 102, she had a terrible odor, she was

vomiting. She told her mother to tell her father, because "I ain't going to get over this anyway." She asked her father to forgive her, telling him she was awfully sick, and said, "I don't think I am going to get over this." Before Drs. Florea and Gartrell would take over the case, the statement was drawn up on a letterhead, for their protection rather than for purposes of a trial. This exhibit No. 1 reads as follows:

"William Earl Florea, D. O. Physician and Surgeon
"Superior, Nebr.
"Affidavit

"State of Nebraska ⎫
⎬ ss.
County of Nuckolls ⎭

"Pauline Killough being first duly sworn upon her oath deposes and says that Pauline Killough of Guide Rock, Nebr., a minor daughter of Sam Killough, of Guide Rock, Nebraska, had an abortion of pregnancy performed upon her the night of the 12th of April, 1939, by Dr. George F. Piercy, of Superior, Nebraska, in his office. Also that she saw no other doctor from that time until her father brought her to the hospital at Superior and called Dr. W. E. Florea because she, Pauline Killough was unable to retain food or water on her stomach, had a high fever, and severe abdominal pains. And that Dr. W. E. Florea and his consultant had no part in the abortion of pregnancy but that they assumed care of the case only to save the life of the girl. That Pauline Killough is at this time of sound mind and judgment.

"The man who was responsible for the pregnancy was/is

*Chester Skeers*
*Mankato*
*Kansas*

*Pauline*
*Killough*"

(Signed) *"Pauline Killough*
"Witnessed by medical consultant Dr. I. D. Gartrell.
"Subscribed and sworn to before me this 23 day of April 1939
"(Seal)                    Oran King, Notary Public."

In this exhibit the words in italics were written by Pauline Killough in bed in the hospital. She died the next day.

The general law as to dying declarations may be stated as follows: "The law looks to the substance rather than to the form, and it does not require that dying declarations must be made in any prescribed form or manner. It is only necessary that the conditions exist which render them admissible as dying declarations, and that their form or manner be such as to render them intelligible. If the rule were otherwise dying declarations would be denied admission in many cases, not because the declarant was not under the sense of impending dissolution and without hope of recovery, but because of the violation of some technical rule. A declarant is not required to prepare his own written declarations in order to have them admissible in evidence. It is wholly immaterial who prepared them if they were read over to him and he understood them and assented to them." 1 R. C. L. 542, sec. 86.

In a prosecution for homicide in procuring an abortion, dying declarations may be admitted in evidence, is the holding of this court in *Edwards v. State,* 79 Neb. 251, 112 N. W. 611, which makes the dying declaration proper in the case at bar under count one of the information. However, the defendant was acquitted on this count.

The statute of Nebraska provides that, if the operation for abortion kills the mother, it is a homicide, and in the case of killing a vitalized fœtus, or embryo, it involves homicide; even though, under our former rulings, a dying declaration might not have been admissible on the second count alone. However, the defendant could have asked the judge to give an instruction to the jury to limit the scope of the dying declaration to the charge set out in count No. 1, but the court did not have to give such limitation instruction unless the defendant asked for it, and as defendant did not ask for it we do not see how it can be reversible error, for the dying declaration was properly admitted under count No. 1. In our opinion, a sufficient foundation was laid for

its introduction, and while it was not a model of what a dying declaration should contain, it gave support upon important facts.

We have examined the errors alleged in the instructions which the court gave on its own motion, and in the refusal to give certain instructions offered by the defendant, and find no prejudicial error therein. We have also examined the alleged error in submitting the second count in the information, and considered whether there was a misjoinder of offenses. Some of these bring up interesting questions for consideration, but we will not extend this opinion to discuss each of them, for we find them without merit.

The defendant was ably defended in the trial in the district court, and his rights were vigorously presented in this court; he was found guilty because the evidence was amply sufficient to convict, in the minds of the jury.

The judgment and sentence of the district court were right, and are in all things affirmed.

AFFIRMED.