# STATE v. ROSE V. ELIAS.[1]

April 21, 1939.

No. 31,840.

*Kleve J. Flakne* and *John Ott,* for appellant.

[1]Reported in 285 N. W. 475.

*J. A. A. Burnquist,* Attorney General, *M. Tedd Evans,* Assistant Attorney General, *Ed J. Goff,* County Attorney, and *Arthur Markve,* Assistant County Attorney, for the State.

GALLAGHER, CHIEF JUSTICE.

Defendant was convicted of manslaughter in the first degree. She appeals from an order denying her motion to set aside the verdict of the jury and the judgment and sentence of the court and to grant a new trial.

Reduced to its simplest terms, the indictment accuses defendant of killing her husband, Joseph Elias, on July 18, 1937.

Elias and his wife lived in St. Louis Park in this state. On the evening in question defendant went to Hopkins, where she was later joined by her husband. On the way home they quarreled, and it appears that decedent slapped his wife. Arriving home the quarrel continued. There is considerable controversy as to the details of what then occurred. During the trouble Elias was stabbed. Defendant applied first-aid measures and later called a doctor, who caused him to be removed to St. Mary's Hospital in Minneapolis. On the following morning Doctors Murphy and Regnier, the attending physicians, determined that an operation was advisable. It was performed that evening, and a few hours later Elias died.

Numerous errors are assigned. It will not be necessary to discuss all of the assignments for the reason that one is determinative of the appeal. Reference will be made to some of the others.

■ Over defendant's objection a statement, purporting to be a dying declaration of decedent, was offered and received in evidence. It embodies decedent's version of the unfortunate incidents surrounding the injury which resulted in his death. That part of the statement most damaging to defendant, inasmuch as it conflicts with a material point in defendant's testimony, reads:

"We went home and I undressed and went to bed. Later on she came and stood over me and challenged me. I told her to get away and go to bed either up here or downstairs. The next thing she hit me with something sharp in the left side. I jumped up to pro-

tect myself. She came for me again and I kicked her. She fell down. I grabbed a knife or something sharp. That is when I got stabbed in the hand. Then she got excited and ran downstairs. and called the doctor. It was about 12:30 a. m."

The statement was made in the presence of Dr. E. A. Regnier, deputy sheriffs Fred Kraemer and Joseph Schutta, and a stenographer attached to the hospital staff. The notes taken by the stenographer were immediately transcribed, and, according to the testimony of those present, the transcribed statement was read to Elias and signed by him in the presence of Kraemer and Schutta. At the top of the statement, in longhand, appear these words:

"Dr. E. A. Regnier first told the patient before making statement that he is in a serious condition and might die tonight."

The question presented is: Was there sufficient foundation to permit the introduction as evidence of the so-called dying declaration?

In prosecutions for homicide the dying declarations of the deceased as to the cause of his injury or as to the circumstances which resulted in the injury are admissible if it be shown, to the satisfaction of the trial court, that they were made when the deceased was in actual danger of death and had given up all hope of recovery. 2 Dunnell, Minn. Dig. (2 ed. & Supps.) § 2461; State v. Cantieny, 34 Minn. 1, 24 N. W. 458; State v. Pearce, 56 Minn. 226, 57 N. W. 652, 1065; State v. Mueller, 122 Minn. 91, 141 N. W. 1113; State v. Findling, 123 Minn. 413, 144 N. W. 142, 49 L.R.A.(N.S.) 449; State v. Hunter, 131 Minn. 252, 154 N. W. 1083, L. R. A. 1916C, 566; People v. Sarzano, 212 N. Y. 231, 106 N. E. 87. Dying declarations reduced to writing from facts drawn out from the deceased and afterwards written down by another and read to the deceased, he assenting to the truth of the written statement, are also admissible. State v. Cantieny, *supra*.

To make a dying declaration admissible, something more is required than that declarant realize the seriousness of his condition and the possibility of death. The testimony offered as a dying

declaration, whether in the form of an oral or a written statement, must have been spoken without hope of recovery and in the shadow of impending death. This state of mind must be exhibited in the evidence and not left to conjecture. Shepard v. United States, 290 U. S. 96, 54 S. Ct. 22, 24, 78 L. ed. 196. In this case Mr. Justice Cardozo, speaking for the court, at p. 100, said:

"Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be 'a settled hopeless expectation' (Willes, J. in Reg. v. Peel, 2 F. & F. 21, 22) that death is near at hand, and what is said must have been spoken in the hush of its impending presence. Mattox v. United States, 146 U. S. 140, 151, 13 S. Ct. 50, 36 L. ed. 917; Carver v. United States, 160 U. S. 553, 16 S. Ct. 388, 40 L. ed. 532; Id., 164 U. S. 694, 17 S. Ct. 228, 41 L. ed. 602; Rex v. Perry [1909] 2 K. B. 697; People v. Sarzano, 212 N. Y. 231, 235, 106 N. E. 87; 3 Wigmore on Evidence, §§ 1440, 1441, 1442, collating the decisions. Despair of recovery may indeed be gathered from the circumstances if the facts support the inference. Carver v. United States, supra; Wigmore, Evidence, § 1442. There is no unyielding ritual of words to be spoken by the dying. Despair may even be gathered though the period of survival outruns the bounds of expectation. Wigmore, § 1441. What is decisive is the state of mind. Even so, the state of mind must be exhibited in the evidence, and not left to conjecture. The patient must have spoken with the consciousness of a swift and certain doom."

This court has considered the circumstances under which dying declarations may be received and has recognized and followed the rule as laid down in Shepard v. United States, supra. In State v. Cantieny, 34 Minn. 1, 10, 24 N. W. 458, 463, it said:

"The facts and circumstances to which we have referred seem to us to have been sufficient to warrant the conclusion of the court that the declaration was made under a conviction of impending death, and without hope of recovery. It was therefore properly allowed to go to the jury."

To the same effect, see State v. Mueller, 122 Minn. 91, 141 N. W. 1113, and State v. Pearce, 56 Minn. 226, 57 N. W. 1065. Courts of other states recognize and follow the same rule. Shepard v. United States, 290 U. S. 96, 54 S. Ct. 22, 78 L. ed. 196; People v. Sarzano, 212 N. Y. 231, 106 N. E. 87; Peak v. State, 50 N. J. L. 179, 12 A. 701; Commonwealth v. Roberts, 108 Mass. 296; State v. Knoll, 69 Kan. 767, 77 P. 580; People v. Hodgdon, 55 Cal. 72, 36 Am. R. 30; Biggs v. Commonwealth, 150 Ky. 675, 150 S. W. 803; Lea v. State, 138 Miss. 761, 103 So. 368.

It is for the court to consider from the evidence whether the declaration was made under circumstances rendering it admissible and to determine whether it should go to the jury as evidence. 1 Phillipps, Ev. 296-298; Stephen, Dig. Ev. (2 Am. ed.) c. 4, art. 26; Wharton, Homicide (3 ed.) § 648; State v. Cantieny, *supra*. The weight to be given dying declarations is for the jury. State v. Pearce, *supra;* State v. Mueller, *supra*. See also 52 L.R.A.(N.S.) 152.

We next approach the question whether deceased, when he made the statements now challenged, spoke without hope of recovery and in the shadow of impending death so as to make his statement admissible as a dying declaration. Dr. Regnier, one of the attending physicians, testified that when he realized the seriousness of Elias' condition he told the latter that he did not know whether he would survive the operation; that there was a good chance that he would not recover; and that his condition was so serious that a statement ought to be taken. He also testified that the sheriff's office was notified and that, about an hour later, a statement was taken in the presence of himself, two deputy sheriffs, and a stenographer. The doctor further testified that just prior to the taking of the statement he again said to Elias: "Your life is really in the balance. If it becomes necessary to undergo a major operation, then your chances of recovery become very remote," and that Elias said he understood. The doctor also testified that Elias authorized him to perform an operation if he thought it best but did not recall whether the patient requested him to notify anyone that the opera-

tion was to be performed. He states that Elias did not "flinch" when told that he might die.

Fred Kraemer, a deputy sheriff, testified that in his presence Dr. Regnier said to Elias: "You are in a very serious condition and you may die before the night is over," and that Elias said: "I understand." Kraemer further testified that after the stenographer's notes were transcribed he read them over to Elias before the latter signed.

As a witness for defendant, Kraemer asserted that on the same occasion and in the hospital room after the statement was taken he heard Elias say to his wife, "If I ever get out of here I will get a divorce for good."

Sister Theresa Regis, who acted as stenographer, testified that before the statement was taken she heard Dr. Regnier tell Elias that "his condition was very serious and that he might not live" and that Elias answered, "I understand." Being asked to repeat what Dr. Regnier told the patient, she testified: "Dr. Regnier told the patient that he was in a serious condition, * * * that he probably would have to be operated."

Defendant testified that while the officers were in the hospital deceased said to her: "Don't you sign any statement. I will take care of that. When I get out of here I will divorce you for good." This was after Elias gave his statement. Defendant further testified that during the afternoon and after the statement was given she had a conversation with her husband in which she told him how desperate she would be if anything happened to him and that he answered: "Hell! I will be back in a little while."

Dr. Murphy, the attending physician, testified that he did not believe that Elias would die until he was taken to the operating room. This was several hours after the statement was made.

It seems to us that the showing made by the state was insufficient to afford a foundation for the introduction of the statement as a dying declaration. The most that can be inferred from what appears to be an almost undisputed account of what occurred prior to the taking of the statement is that decedent was informed of the

seriousness of his condition and that he consented to an operation. He seemed to be more concerned about the benefits to be derived from the operation than with the solemnity which the statement should be given and the seriousness of the purpose for which it was taken. Decedent's most serious concern at the time seemed to be that he recover so that he could proceed to divorce his wife.

It is difficult to believe that one standing in the shadow of impending death and without hope of recovery would be concerned about procuring a divorce in the future. In any event, he did not disclose a state of mind showing that his statements were made without hope of recovery and in the shadow of impending death. To find otherwise we must resort to conjecture, and under the rule long recognized we cannot do this.

■ William R. Reilly, a justice of the peace residing in St. Louis Park, was permitted to testify for the state that in October, 1935, Elias called at his home, that his face and shirt were covered with blood, and that there were marks on his body. He further testified that Elias at the time was carrying a rolling pin, one handle of which was bent and which also was spotted with blood. Objection to conversations between Reilly and Elias was sustained. Later, on defendant's motion, the trial court struck Reilly's testimony from the record but denied her request that the jury be instructed to ignore the testimony. Undoubtedly, the testimony offered was incompetent, and we do not believe that striking it from the record removed the natural prejudice it created, particularly in view of the fact that one of the prosecuting attorneys in the opening statement to the jury related what Elias told Justice Reilly at the time. The trial court realized before the conclusion of the case that this was error and struck the testimony from the record. In the case of a new trial, it should not be referred to in the opening statement, or offered or received. See State v. Yates, 99 Minn. 461, 109 N. W. 1070; Throckmorton v. Holt, 180 U. S. 552, 21 S. Ct. 474, 45 L. ed. 663; Evans v. C. M. & St. P. Ry. Co. 133 Minn. 293, 158 N. W. 335.

Numerous other errors are assigned. Those most seriously pressed have to do with alleged acts of misconduct on the part of the prosecutors. Particular objection is registered against prejudi-

cial statements contained in the opening statement to the jury. We have already referred to the most objectionable of these statements. We deem it sufficient to say that in some respects the prosecutor's conduct verged on the border line. Often this results from an excess of zeal rather than from a desire to do a defendant an injustice. Much discretion is left to the trial court as to what is improper by way of argument. We trust that the court will require a more tempered opening statement and closing argument in the event of a new trial.

Reversed and new trial granted.

MR. JUSTICE HILTON, incapacitated by illness, took no part.

