**STATE of Minnesota, Respondent,**

v.

**Joseph John BERGERON, Appellant.**

**No. C9–89–1241.**

Supreme Court of Minnesota.

March 23, 1990.

John Stuart, Minn. State Public Defender, Marie L. Wolf, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, State Atty. Gen., St. Paul and Thomas L. Johnson, Hennepin County Atty., Minneapolis, for respondent.

WAHL, Justice.

Joseph John Bergeron appeals his conviction for murder in the first degree in violation of Minnesota Statutes § 609.185(3) (1988), intentional murder while committing or attempting to commit a burglary. The conviction arose from the stabbing death of Thomas Berger. After a jury trial, defendant was sentenced to life imprisonment. Before this court he argues that the trial court erred in admitting a so-called dying declaration, that there was insufficient evidence to show that he committed a burglary or that he acted with intent to kill, and that the trial court erred in excluding testimony from defendant concerning his intent when he entered Berger's home. We affirm the conviction.

At 1:35 a.m. on September 15, 1988, police officer Donald Brown responded to an emergency telephone call that there had been a shooting at 3542 Irving Avenue North, Minneapolis. Brown entered the first floor apartment and found Thomas Berger, bleeding profusely from a wound under his rib cage, lying in a pool of blood. Before the paramedics arrived, Brown asked Berger "Who did this to you?" Berger said "Joe." Brown said "Who's Joe?" and Berger said "Joe Bergeron, Bergeron shot me." Another police officer at the scene, attempting to stem the flow of blood, asked, "Who shot you?" and received the same answer. Berger was panicking because he could not breathe. When he said, "I'm dying, aren't I?," the paramedic replied, "Well, you're not doing real good." The paramedic could not insert an i.v. in Berger on the way to the hospital because Berger's body was "shutting down" and when Berger said he was going to die, the paramedic replied, "Let's get you to the hospital."

Berger bled to death of eight stab wounds. The last stab wound had severed his spinal cord and probably resulted in immediate paralysis. A small tip of a knife blade was found in Berger's vertebra. The stab wounds and the knife tip were found by the coroner to be "consistent with" the single-bladed knife with a broken tip to which Billy Lyman, one of the two minor accomplices, led police officers, a few hours after the stabbing.

The police arrested defendant on the basis of Berger's statement before his death and on Berger's description of the defendant as the brother of his girlfriend Chris Bergeron. Berger had given the police officer who rode with him in the ambulance Chris Bergeron's telephone number and asked that she be contacted. At Chris Bergeron's apartment, the police found defendant lying in front of the television sleeping. Also sleeping on the floor was Chad Knight, 15 years old. Both men were placed under arrest and read their *Miranda* rights. Defendant had a scratch on

his neck. A third suspect apprehended running from the Bergeron apartment was later identified as Billy Lyman, also a minor, 16 years old. Lyman had an injured wrist.

At the Bergeron apartment, the police found bloody clothing on top of a heating duct in the basement, and a leather jacket with torn electrical cord in it. At Berger's home, police officers recovered the slashed screen of a basement window and, from Berger's bedroom, pieces of a broken puka shell necklace later identified as belonging to defendant. In Berger's bedroom police also found a mirror with some white powder on it and a 9–millimeter semi-automatic pistol in the dresser.

Defendant told four stories to the police regarding his involvement in the death of Berger. After being read his *Miranda* warning, defendant told his arresting officer that he didn't know anything about the stabbing. Later, defendant told Brown that his sister and Berger had gotten into a fight earlier in the evening at Berger's house. He said that his sister had gone home and that a few hours later he and Chad Knight went to Berger's house. Defendant said that Berger told them to leave because he had to go to work the next morning. Defendant initially said that he went home, threw up and then fell asleep on the floor.

In yet a third statement, after the police told defendant a shell necklace belonging to him was found in Berger's bedroom, defendant repeated his second story but admitted returning to the house a second time. Defendant testified that he had been drinking heavily all evening.[1] He said that the second time he went to Berger's house, he went inside, then turned around and left. As he was leaving, he noticed that Knight and Lyman were not with him. He went back inside and found Knight and Lyman in Berger's bedroom. Berger woke up and a fight ensued. Eventually, all three ran out, and along the way Bergeron Knight and Lyman had used marijuana.

was handed a knife, which he stuck in the ground between two houses. He said they all went to Bergeron's house where he noticed Lyman had a cut; he helped care for the cut, then they all went to bed.

At trial, defendant told a different version of what happened. Defendant testified that on the evening before the stabbing incident, he struck a deal with Berger to sell him a gun for $100.00 plus a gram of cocaine. Berger paid $100 and took the gun, promising the cocaine later. He said he went to Berger's house with Knight and Lyman about 10:30 p.m. to pick up the cocaine. They knocked on the back door and Berger answered it. Defendant testified that Berger was angry with defendant for bringing Knight and Lyman and he told defendant he did not have the cocaine and to come back later.

Defendant, Knight and Lyman went back to Chris' apartment and returned to Berger's house around 1:00 or 1:30 a.m. Defendant testified that the back door was still open and he went inside alone to Berger's apartment in order to pick up the cocaine. Defendant said he knocked on the door the second time and went inside the house to Berger's bedroom. He had told Knight and Lyman to wait outside. Berger cut some lines of cocaine and the two snorted it. Somehow, defendant testified, Knight and Lyman entered the house, and came into the bedroom. Defendant said that Berger became very angry because he thought that defendant was "setting him up." Defendant said that Berger started "swinging" and came after him; defendant hit back and the next thing he knew Lyman and Knight joined the fracas. Defendant said that he tried to run out of the apartment after he saw that Berger was bleeding. He said that after a few minutes they all ran from the house and as they were running away, he saw that Knight had a knife gripped in his hand. He took the knife from Knight and jammed it into the dirt in between two houses. Then they all went home and went to sleep.

Chad Knight pled guilty as an adult to burglary, and guilty as a minor to first degree murder. His probation, drug treatment and jail time were conditioned on his testifying at defendant's trial.[2] Knight testified that he, Lyman, defendant and Chris Bergeron had been drinking all day. At approximately 7:30 or 8:00 p.m., Berger came to Chris Bergeron's house and defendant offered to sell Berger a 9-millimeter gun for $100.00. Berger gave defendant the money and took the gun. Berger and Chris Bergeron went out for a drink, then Chris returned, mad at Berger. Knight said that the parties continued to drink, and he thought that at around 11:30 or 12:00, defendant said that they were going to go back to Berger's house to get the gun back. Knight said that defendant gave them each a ripped piece of electrical cord so that they could "strangle anybody." Knight said that defendant wanted to burglarize the house. He testified, though he admitted he could not say for sure, that the first time they went to the house defendant used a knife to split open a basement window screen. Knight could not identify the knife the police had recovered. Knight said he thought all three entered the house through the basement window and that they went up the basement stairs to the kitchen door and knocked on the door. Knight said that defendant called out for Berger. Berger came to the door, and defendant told Berger that his sister was upset and throwing things around. Berger said "call the police" and went back to bed. Knight also said that on the first visit, all three went to the upstairs apartment looking for things to steal; Knight said he took $20.00 from the upstairs apartment. The occupant of the upstairs apartment later reported $20 missing. Knight did not remember whether they went upstairs before or after they talked to Berger. Knight said that after they spoke with Berger they left. He said they went home and continued to drink.

Approximately 45 minutes after they returned to Chris Bergeron's house, Knight said defendant suggested going back to

---

2. Defendant William Lyman refused to testify, even after offered immunity, and was sentenced to a minimum of 60 days in jail for contempt of court.

Berger's house. Knight did not remember whether they went to Berger's apartment through the basement window or whether they went in through the back door. Knight said that they went downstairs and searched the basement apartment for money and drugs. Then they all went upstairs into Berger's bedroom. Soon after they went into Berger's bedroom, Berger woke up and said "Who's that?" He started to get up and defendant said "Lay back down or I'll shoot your head off." Then Berger got up and went after defendant. All three of the parties became involved in the fight, and Knight admitted to hitting Berger in the ribs. Knight said that defendant was hitting Berger using an underhand motion. At no time did Knight see a knife in defendant's hand. After Berger fell to the floor, Knight said they all ran out the door. Outside the house, Knight said he saw something in defendant's hand. They all ran toward Chris Bergeron's house, and on the way, they stopped in between two houses where defendant stuck something into the ground. When they got home, they realized Lyman was injured and had blood all over him.

The jury found the defendant guilty of murder while committing or attempting to commit a burglary.

■ 1. Defendant first argues that the trial court erred in ruling that Berger's statement identifying defendant as his assailant met the foundational requirements for the dying declaration exception to the hearsay rule and that the admission of that statement was reversible error. The dying declaration exception to the hearsay rule is set out in Minn.R.Evid. 804(b)(2).

(b) The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

＊　　＊　　＊　　＊　　＊　　＊

(2) *Statement under Belief of Impending Death*

In a prosecution for homicide ＊ ＊ ＊ a statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.

■ We have said, in applying this rule, "[i]t is for the court to consider from the evidence whether the declaration was made under circumstances rendering it admissible and to determine whether it should go to the jury." *State v. Elias,* 205 Minn. 156, 160, 285 N.W. 475, 477 (1939). The jury decides the weight to be given the statement. *Id.* As with all evidentiary rulings, whether to admit the dying declaration rests within the discretion of the trial court. *Cf. State v. Eubanks,* 277 Minn. 257, 262, 152 N.W.2d 453, 456–57 (1967).

■ The foundational requirement for the admission of a dying declaration is well-settled.

To make a dying declaration admissible, something more is required than that declarant realize the seriousness of his condition and the possibility of death. The testimony offered as a dying declaration ＊ ＊ ＊ must have been spoken without hope of recovery and in the shadow of impending death. This state of mind must be exhibited in the evidence and not left to conjecture.

＊　　＊　　＊　　＊　　＊　　＊

'Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be "a settled hopeless expectation" that death is near at hand, and what is said must have been spoken in the hush of its impending presence.'

*State v. Elias,* 205 Minn. at 158–59, 285 N.W. at 476–77 (citations omitted). *See also State v. Lubenow,* 310 N.W.2d 52, 56 (Minn.1981). When examining the foundation for a dying declaration, the focus is on the victim's state of mind, which may be supported by direct or circumstantial evidence. *State v. Brown,* 209 Minn. 478, 484–85, 296 N.W. 582, 586 (1941).

Defendant was asked at least twice "who had done this to him." On both occasions he responded that "Joe" or "Joe Bergeron" had shot him. Officer Diedrich, who stayed with Berger when the paramedics arrived, said that Berger was panicky and kept saying he couldn't breathe. He was gasping for breath. Diedrich testified that

Berger said to the paramedic "I'm dying aren't I?" or "I am going to die, aren't I?" and that the paramedic responded "Well, you're not doing real good" or "It doesn't look too good."

This court has strictly construed the dying declaration exception to the hearsay rule. As recently as 1981, in *State v. Lubenow*, 310 N.W.2d at 56, we reversed the admission of a dying declaration on the grounds that there was insufficient evidence to show that the victim had an imminent apprehension of her death. Based on the strict approach to the dying declaration exception, alone, Berger's statement that "I am dying" or "I am going to die, aren't I" is arguably insufficient evidence of Berger's belief in his imminent death to fulfill the foundations for admissibility. *But see Brown*, 209 Minn. at 485–86, 296 N.W. at 587 (statement that victim knew she was going to die satisfies requirements of admissibility).

The victim's belief in his impending death may also be inferred, however, from the surrounding circumstances. There are circumstances here from which the trial court could conclude that Berger made his statement about his assailant with a firm and unshakable belief in his impending death. When Berger was found, he was lying in a pool of blood with eight stabs wounds. The last stab wound severed his spinal cord and probably paralyzed him. Berger's lungs and abdominal cavity were filled with blood because of the stab wounds. Officer Diedrich and the paramedic testified that Berger's breathing was extremely labored because of his lung wound. There was testimony that Berger was panicking because he couldn't breathe, and kept saying "I can't breathe." The paramedic also testified that Berger started to go into severe shock, and that his body was "shutting down."

This court has held that the seriousness of a decedent's wounds and the fact that he died soon after making the declaration are circumstantial evidence of the victim's belief in his impending death. *Eubanks*, 277 Minn. at 260, 152 N.W.2d at 455; *Brown*, 209 Minn. at 484–85, 296 N.W. at 586. Ad-

ditionally, when a declarant is told by another that he is going to die, or is in serious condition, often this is circumstantial evidence supporting the declarant's belief in impending death. *See generally Sufficiency of Showing of Consciousness of Impending Death, by Circumstances Other Than Statements of Declarant, to Justify Admission of Dying Declaration*, (1973 & Supp.1989). *But see Lubenow*, 310 N.W.2d at 56 ("something more than the seriousness of the victim's injuries and the possibility of death must be shown to make statements admissible as dying declarations").

Defendant argues that the statement should not have been admitted because Rule 804(b)(2) requires that the statement concern the cause or circumstances of the death. Defendant maintains that because Berger said that defendant shot him instead of stabbed him, the reliability of the statement is suspect. However, according to Knight, while defendant was in Berger's bedroom, he said to Berger, "Lie down or I'll shoot your head off." Berger had reason to believe defendant had a gun because the gun he had bought from defendant was in his room. Defendant's threat to shoot decedent, the fact that there was a gun in Berger's bedroom, and the physical evidence that Berger was most likely paralyzed after he was stabbed are indications that the statement was reliable.

The trial court heard evidence that Berger said that he was dying; that statement together with the seriousness of his wounds, his labored breathing, his probable paralysis and his death within two hours of making the statement, was sufficient evidence to allow an inference that Berger made the statement at a time when he thought he was dying. Since the admission of evidence rests within the sound discretion of the trial court and we can find no abuse of discretion here, we hold that the trial court did not err in ruling that defendant's statement met the foundational requirements of a dying declaration and in admitting that statement into evidence.

■ 2. Next defendant contends that the evidence was insufficient to show that

he committed a burglary or that he acted with intent to kill Thomas Berger. The jury was instructed that in order to convict defendant of felony murder in the first degree, it must find that he, or one or more persons intentionally aided and abetted by him, engaged in the act of committing or attempting to commit the crime of burglary. Defendant claims that he was in Berger's house with Berger's consent and that the only evidence that he was committing or attempting to commit a burglary was the testimony of his accomplice, Chad Knight.[3] Defendant contends that because Knight's testimony was the uncorroborated testimony of an accomplice, it was insufficient as a matter of law to sustain his conviction for felony murder.

When reviewing a question of whether the evidence was sufficient to sustain a conviction based on the testimony of an accomplice, the evidence is reviewed in a light most favorable to the state; all inconsistencies in the evidence are also resolved in favor of the state. *State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980).

Minnesota Statutes section 634.04 (1988) provides:

> [a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

The testimony of an accomplice is inherently untrustworthy and must be supported by independent evidence. The corroborating evidence to an accomplice's testimony must "link or connect the defendant to the crime. It is not necessary that it establish a prima facie case of the defendant's guilt. It must point to the defendant's guilt in some substantial degree. * * * Corroborating evidence may be circumstantial or direct." *Adams*, 295 N.W.2d at 533 (citations omitted). *See also State v. Houle*, 257 N.W.2d 320, 324 (Minn.1977). Examples of evidence which may be used as corroboration of an accomplice's testimony include

> the defendant's association with those involved in the crime in such a way as to suggest joint participation, as well as from the defendant's opportunity and motive to commit the crime and his proximity to the place where the crime was committed. * * * The defendant's entire course of conduct may be looked to for corroborating circumstances. If his connection to the crime may be fairly inferred from those circumstances, the corroboration is sufficient.

*Adams*, 295 N.W.2d at 533 (citations omitted). Corroborative evidence may also include physical evidence associated with the crime, "suspicious and unexplained conduct of the accused either before or after the offense [and] * * * inadequacies in [the accused's] testimony * * *." *State v. Mathiasen*, 267 Minn. 393, 398, 127 N.W.2d 534, 538 (1964).

The record contains the following evidence which corroborates the testimony of the accomplice: Chad Knight testified that the purpose of going over to Berger's house was to steal back the gun defendant had sold him. Knight stated that before they went over to Berger's house the first time, defendant had given each of them a ripped piece of electrical cord, to be used "to strangle anybody." When the police arrived at Chris Bergeron's house, they found a grey leather jacket, belonging to Knight, with a ripped piece of electrical cord in the pocket.

Knight testified that when they went to Berger's home, defendant slit the basement screen. One of the first things discovered by Officer Brown when he arrived at the scene was a window screen in the basement which had been slit open.

Knight testified that on one of their visits to Berger's house, the three had gone upstairs and rifled through the upstairs apartment looking for things to steal. Knight testified that he took $20.00 from the upstairs apartment. The upstairs ten-

---

**3.** Chad Knight having been charged with the same offenses as defendant falls squarely into the category of accomplice. *State v. Jensen*, 289 Minn. 444, 446, 184 N.W.2d 813, 815 (1971).

ant, Tom Finnucan, reported that $20.00 was missing from his apartment.

There was also corroboration regarding the knock at the back door. Knight testified that as he remembered, the first time they went to Berger's home, at approximately 11:30 or 12:00, they entered through the basement window, went up the basement stairs to the kitchen door, and knocked on the door leading from the basement to the kitchen. William Meuwissen, the basement tenant, testified that between 10:45 and 11:00 p.m. he heard a knock at the back door. He heard Berger answer the door. Although there were some differences in the testimony of Knight and Meuwissen, Meuwissen's testimony concerning the knock on the door corroborated Knight's testimony. The jury was free to disregard Knight's testimony that he thought they went to Berger's house around 11:30 or 12:00.

Knight testified that the three returned to Berger's home around 1:00 or 1:30 intending to burglarize the house. When the three went into Berger's bedroom and stood around the bed, Berger woke up and asked what was happening and defendant told him to lie down. Meuwissen, the downstairs tenant testified that, at approximately 1:30 a.m., he woke up and heard Berger say, "Just leave me alone, leave me alone, I'll give you whatever you want. Just leave me alone." Meuwissen's testimony corroborates Knight's story that on the second visit defendant intended to burglarize the house and that Berger woke up while they were in his bedroom.

In addition to independent corroboration of Knight's version of the story, defendant has admitted that he went to Berger's home both times with Knight and Lyman. Defendant was associated with at least one person who was admittedly involved in the crime. More importantly, defendant admitted selling the gun to Berger. Whether the jury believed Knight, that it was sold for $100.00, or whether they believed defendant, that it was sold for $100.00 plus a gram of cocaine, defendant admitted at trial that he sold the gun for less money than he intended. This admission supplies a mo-

tive for the attempted burglary of Berger's home. The evidence of corroboration was sufficient.

Appellant also argues that the evidence was insufficient to show that he acted with intent to cause Berger's death. Apart from the dying declaration of Berger, the only evidence that defendant stabbed Berger is Knight's testimony that after the three ran from the house, defendant had something in his hand, which he hid in the grass in between two houses. The broken knife was later found in between the two houses. Defendant admits he hid the knife, but contends that he hit Berger only with his fist and that he took the knife from Knight. Defendant's conduct after the crime is one of the circumstances from which criminal intent may be inferred. *In re Welfare of M.D.S.*, 345 N.W.2d 723, 733–34 (Minn.1984).

In addition, Knight testified that although he did not see defendant stab Berger, he saw defendant hitting Berger with an upward swing. The stab wounds were consistent with a knife being used in an upward motion. The police also found in Berger's bedroom a broken puka shell necklace which defendant admitted was his. The presence of a broken necklace in Berger's bedroom is consistent with Knight's story of a struggle between defendant and Berger.

Apart from Knight's testimony, there is Berger's dying declaration which is evidence that defendant wounded Berger. Additionally, the defendant's statements as to his intentions are not binding on the jury if his acts demonstrate a contrary intent. *State v. Lundstrom*, 285 Minn. 130, 140, 171 N.W.2d 718, 724–25 (1969). Finally, based on this court's opinion in *State v. Raymond*, 440 N.W.2d 425 (Minn.1989), there was ample evidence for the jury to conclude—based on the severity of Berger's injuries—that defendant intended to cause his death. *Id.* at 426 ("[i]ntent to cause the result of * * * death could be inferred from nature and extent of the wounds"). We hold the evidence showing that defendant committed a burglary and that he intended to kill was sufficient to

sustain his conviction for first degree felony murder.

3. The final issue is whether the trial court erred in sustaining the prosecution's objection to the defendant's testimony concerning his intent when he entered Berger's apartment. Towards the end of defendant's direct examination, after fully telling his side of the story, defendant was asked the following question:

> Q: [by Mr. Reynolds] Joe, when you went over to Tom Berger's house that night, either one of the two times, did you go over there with the intention of burglarizing his house?
>
> A: No.
>
> Q: Did you go over there with the intention of stealing anything from him?
>
> A: No.
>
> Mr Jung.: I'm going to object, Your Honor, self serving.
>
> The Court: The objection is sustained. The jury will disregard the question and the answer.

Appellant contends that the trial court erred in sustaining the objection that the testimony was self-serving. He argues that the trial court's ruling impermissibly infringed on his constitutional right to testify on his own behalf, and he is thus entitled to a new trial.

Modern rules of evidence have abolished the common law rule that defendants are disqualified from testifying on their own behalf because of incompetency or bias, i.e., self-interest. *McCormick on Evidence*, §§ 40, 65 at 85–87, 159–61 (3d ed. 1984); *Weinstein's Evidence*, ¶ 601[03] (1986). *See generally* Minn.Stat. § 595.02, subd. 1 (1988). The objection that testimony is "self-serving" appears to be a variation on the objection that a defendant is incompetent to testify because of an "interest" or "bias" in the case. *McCormick*, § 40, at 86–87. Simply put, this is not really a valid objection under the Minnesota or Federal Rules of Evidence. *Id.* at 86 ("[s]elf-interest of the witness is manifest

when he is himself a party"). Rules of evidence now provide other methods by which a criminal defendant's testimony may be questioned.[4]

This court has recognized that a defendant has a constitutional right to testify on his own behalf. *State v. Rosillo*, 281 N.W.2d 877, 878 (Minn.1979). In *Rosillo*, we refused to characterize a defense counsel's failure to allow a criminal defendant the right to testify as a harmless error. *Id.* at 879. This refusal to adopt the harmless error rule was made in the context of a situation where the defendant was not allowed to take the stand to testify on his own behalf. Such is not the case here.

The state points out that the defendant had a full and fair opportunity to tell his side of the story. Defendant made clear, through his entire version of the story, that he did not intend to steal from Berger. This story was fully brought out in defendant's direct examination. Additionally, when defendant was asked whether he intended to burglarize Berger's home, he was allowed to answer, so the question, "did you intend to steal anything?" was somewhat repetitive. The jury could have reasonably inferred from defendant's story that he did not intend to burglarize Berger's home because he testified that he went to Berger's house to collect the gram of cocaine.

The intent of the defendant upon entering Berger's home was a crucial element of the offense of burglary, but the defendant had a full and fair opportunity to tell his side of the story, including his lack of intent to steal. We hold that under the facts and circumstances of this case the trial court did not err in limiting defendant's repetitious denial of guilty intent. Defendant's conviction of first degree felony murder is affirmed.

Affirmed.

---

**4.** In addition, the trial court read a jury instruction concerning the credibility and interest of witnesses.