*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0469**

State of Minnesota,
Respondent,

vs.

Robert Todd Ferguson,
Appellant.

**Filed February 6, 2017
Reversed
Rodenberg, Judge**

Carlton County District Court
File No. 09-CR-14-1754

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Thomas H. Pertler, Carlton County Attorney, Carlton, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Lydia Maria Villalva Lijó, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Kirk, Presiding Judge; Halbrooks, Judge; and Rodenberg, Judge.

## U N P U B L I S H E D   O P I N I O N

**RODENBERG**, Judge

        Appellant Robert Ferguson challenges his conviction of third-degree murder, arguing that (1) the conviction was based on the uncorroborated testimony of an accomplice, and (2) the state failed to prove that appellant's actions were the proximate

cause of death. Appellant also raises several pro se arguments. Because the evidence of record fails to sufficiently corroborate the accomplice testimony on which appellant's conviction rests, we reverse.

**FACTS**

On January 15, 2014, P.M. consumed fentanyl at appellant's house and later died of a fentanyl overdose. The state charged appellant with third-degree murder, in violation of Minn. Stat. § 609.195(b) (2012), for selling or providing the fentanyl that caused P.M.'s death.

Before trial, appellant moved the district court to dismiss the complaint as being based on the uncorroborated statements of C.F., appellant's adult daughter, who had been granted immunity in exchange for her agreement to cooperate with the state's prosecution of appellant. The district court denied appellant's motion, finding that C.F. was an accomplice, but that sufficient evidence corroborated her statements to police.

At trial, C.F. testified that, sometime before January 15, 2014, she, P.M., and appellant, who had a prescription for the medication, arranged for P.M. to buy fentanyl from appellant. According to C.F., it was agreed that P.M. would buy the fentanyl from appellant for $60. C.F. testified that, on the night of January 15, 2014, she and P.M. picked up a friend, M.B., at a theater and then drove to appellant's house to buy the fentanyl. C.F. testified that they waited outside of appellant's house for 20 minutes until C.F. called appellant and he arrived to let them into the house. C.F. testified that appellant walked into the house with them, that appellant's girlfriend was in the living room when they walked into the house, and that the girlfriend's son was also in the home.

2

C.F. testified that she heard appellant and P.M. discuss a fentanyl patch in the kitchen, while she stayed in the living room. C.F. testified that M.B. and P.M. then left to get money from an ATM, and that C.F. went upstairs with appellant, where he removed a fentanyl patch from a black safe. C.F. testified that, when P.M. and M.B. returned, appellant and C.F. walked down to near the bottom of the staircase. C.F. testified that, while standing on the bottom steps of the staircase, appellant made a comment about not wanting "blood on his hands," before handing her the fentanyl patch. C.F. testified that she then passed the fentanyl patch to P.M., who in turn gave the money to appellant.

C.F. testified that she then followed appellant upstairs, stayed there for several minutes, and returned downstairs, where she saw P.M. and M.B. sucking on the clear wrapper of the fentanyl patch. C.F. testified that P.M. and M.B. had cut the fentanyl patch into two pieces in the kitchen and threw away the wrapper. C.F. testified that P.M. soon began gasping for air and fell to the floor. C.F. testified that appellant's girlfriend came into the living room, kicked P.M., and demanded that they leave the house. C.F. testified that M.B. and the girlfriend's son moved P.M. to the car, and that C.F. drove M.B. to his car before taking P.M. to his parents' house. P.M. was declared dead at his parents' home.

M.B. also testified about the events of January 15, 2014. He testified that he had communicated with P.M. throughout the day by text messages and phone calls, eventually agreeing to meet in the evening to play video games at a hotel. P.M. sent a text message to M.B. indicating that he was supposed to get "that patch" when C.F. was ready. P.M. sent a text message to M.B. that C.F. was his girlfriend and "her dad has [it] so [it's] all good." M.B. testified that he had spoken to P.M. earlier, and that P.M. indicated that he

3

wanted a fentanyl patch and may be able to get one, but had not told M.B. how he would procure it.

M.B. further testified that P.M. and C.F. met him near a theater, where they sat in P.M.'s car for 15 minutes waiting for C.F. to receive a phone call to let them know when to go to appellant's house. M.B. testified that, while in the car, P.M. told him that the plans for the evening had changed. M.B. testified that P.M. told him that they would not be going to a hotel as previously planned and would instead hang out at appellant's house because P.M. was not sure they would have enough money for a hotel room. M.B. testified that he understood from the conversations with P.M. and C.F that they would buy the fentanyl from appellant, who had a prescription for it, and they would go to appellant's house to obtain it. M.B. testified that all conversations concerning the patch and the transaction went through C.F. He also testified that, while he understood that they were buying the patch from appellant, P.M. never told M.B. that he had dealt or negotiated directly with appellant.

M.B. testified that, after C.F. received a phone call, they went to appellant's house and entered. No one was downstairs, so P.M. and M.B. sat on the couch while C.F. went upstairs. Appellant came downstairs and C.F. introduced him to P.M. and M.B. M.B. testified that there was no conversation with appellant about fentanyl, a patch, or cost. He said that appellant then grabbed a drink and went upstairs. M.B. testified that C.F. then told them that they would need to go get money to buy the fentanyl.

M.B. testified that, when they returned from getting cash, C.F. was standing on the staircase. M.B. testified that C.F. took the $60 and went upstairs, returning with a fentanyl

4

patch ten or fifteen minutes later. M.B. testified that he understood that C.F. went to buy the patch from appellant, but testified that appellant was not present when the money or fentanyl was transferred. M.B. testified that C.F. returned downstairs with the fentanyl patch and that he and P.M. cut it in half and consumed the fentanyl gel by mouth, despite it being intended for use as a dermal patch, and put the residual packaging in the kitchen garbage. M.B. testified that P.M. became drowsy and then a woman "came home" and told them to leave. They did, and P.M. later died.

Law enforcement officers testified about the investigation following P.M.'s death. Commander Ferrell went to appellant's house on the night of P.M.'s death after C.F. told investigators that they had been at appellant's house earlier. He testified that he knocked on the door of appellant's house for several minutes. He testified that he saw appellant's girlfriend walk down the stairs and then pass by the door at which he was knocking. Commander Ferrell continued to knock until the woman answered the door a minute or two later. Investigator Danielson arrived at the house and looked in the garbage can in the kitchen. He located no evidence of fentanyl wrappers. After obtaining a search warrant for appellant's house, two fentanyl outer wrappers and a fentanyl prescription box were located in appellant's bedroom. The search revealed a white safe, but no black safe.

The state's theory at trial was that appellant may have had an extra fentanyl patch on the day of the overdose if he had used his patches for precisely 72 hours each, as prescribed, and if he started his December 2013 prescription as soon as it was filled. A pharmacist testified that appellant received one fentanyl patch on January 14, 2014. Appellant testified that he immediately put on the fentanyl patch he received on January 14

and that he had no additional fentanyl in his house on the day of the overdose, but that there may have been used patches in the trash. Appellant testified that he had owned a black safe, but it had been stolen before January 15, 2014. Appellant also testified that access to the safe where he kept his medicine was limited to himself and his girlfriend.

At the close of the state's case, appellant moved the district court to dismiss the case because there was insufficient evidence to corroborate C.F.'s testimony. The district court denied the motion, finding sufficient evidence to submit the issue of corroboration to the jury. The district court instructed the jury that C.F.'s testimony, as an accomplice, was required to be corroborated by evidence that tends to show that appellant committed a crime. *See* 10 *Minnesota Practice*, CRIMJIG 3.18 (2015). The jury returned a guilty verdict.

This appeal followed.

### D E C I S I O N

The jury found appellant guilty of the charged offense of third-degree murder. The elements of the offense are: (1) that P.M. died; (2) the death was proximately caused by appellant having directly or indirectly sold, given away, bartered, delivered, exchanged, distributed, or administered fentanyl; and (3) that appellant's act took place on or about January 15, 2014, in Carlton County. Minn. Stat. § 609.195(b); *see also* 10 *Minnesota Practice*, CRIMJIG 11.40 (2015) (providing the elements of controlled-substance murder). The only element in dispute here is the second element and, more specifically, that portion of the second element relating to whether appellant directly or indirectly participated in the sale of fentanyl to P.M.

6

Appellant argues on appeal that the evidence was insufficient to support his conviction because C.F. was either the perpetrator of the crime or, if not, she was an accomplice whose testimony must be corroborated in order to convict him. The state filed no responsive brief on appeal.[1] We therefore consider the appeal on the merits. Minn. R. Civ. App. P. 142.03. We derive our understanding of the state's legal position from scrupulous review of the district court record, including the state's arguments in response to the motions to dismiss and the state's trial summation.

In considering a challenge to the sufficiency of the evidence, our role is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach their verdict." *State v. Caine*, 746 N.W.2d 339, 356 (Minn. 2008). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, reasonably could conclude that the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

C.F.'s testimony was the only evidence directly connecting appellant to the sale or distribution of fentanyl to P.M. If her testimony is believed, she was an accomplice to the crime. Her testimony included an admission that she directly sold fentanyl to P.M., and by all accounts P.M. died as a result of a fentanyl overdose. Since the jury returned a verdict

---

[1] This is a very serious case. A young man lost his life after consuming illegally sold fentanyl, a powerful narcotic. Because the state failed to file a brief, we are left to construct the state's position from the record as constituted, and without the benefit of focused counterarguments to those presented by appellant.

of guilty, it necessarily believed C.F.'s testimony, which amounted to her claim to have been an accomplice to appellant's sale of a fentanyl patch to P.M. *See State v. Scruggs*, 822 N.W.2d 631, 640 (Minn. 2012) (providing that a witness is an accomplice if the witness could have been charged and convicted of the same crime as the defendant). But a conviction may not rest on the uncorroborated testimony of an accomplice. Minn. Stat. § 634.04 (2012). Corroboration is required because of the inherent untrustworthiness of an accomplice, who "may testify against another in the hope of or upon a promise of immunity or clemency or to satisfy other self-serving or malicious motives." *State v. Shoop*, 441 N.W.2d 475, 479 (Minn. 1989).

Because C.F. was an accomplice, Minnesota law requires her testimony to be "corroborated by such other evidence as tends to convict the defendant of the commission of the offense." Minn. Stat. § 634.04. We review the sufficiency of the evidence corroborating an accomplice's testimony in the light most favorable to the state, and resolve all conflicts presented by the evidence in favor of the verdict. *State v. Nelson*, 632 N.W.2d 193, 202 (Minn. 2001). But "whether the evidence *sufficiently* corroborates the accomplice's testimony is a legal question that we review de novo." *State v. Clark*, 755 N.W.2d 241, 263 (Minn. 2008).

Evidence is not sufficient to corroborate an accomplice's testimony "if it merely shows the commission of the offense or the circumstances thereof." Minn. Stat. § 634.04. Corroborating evidence is sufficient when it is "weighty enough to restore confidence in the truth of the accomplice's testimony." *Clark*, 755 N.W.2d at 253. The corroborating evidence need not establish a prima facie case of guilt, but it must "affirm the truth of the

accomplice's testimony and point to the guilt of the defendant in some substantial degree." *State v. Chavarria-Cruz*, 839 N.W.2d 515, 519 (Minn. 2013) (quotation omitted). "The precise quantum of corroborative evidence needed necessarily depends on the circumstances of each case," and the accomplice's testimony need not be corroborated "on every point or element of the crime." *Clark*, 755 N.W.2d at 253-54 (quotation omitted); *State v. Lemire*, 315 N.W.2d 606, 610 (Minn. 1982). Evidence that may corroborate an accomplice's testimony includes: "physical evidence associated with the crime, the testimony of eyewitnesses and experts at trial, inadequacies and admissions in a defendant's testimony, and suspicious and unexplained conduct of an accused before or after the crime." *State v. Pederson*, 614 N.W.2d 724, 732 (Minn. 2000) (citations omitted). However, evidence that is as consistent with a defendant's innocence as with guilt is not sufficient to corroborate the accomplice's testimony. *State v. Wallert*, 402 N.W.2d 570, 572 (Minn. App. 1987), *review denied* (Minn. May 19, 1987).

The record contains lots of evidence concerning the events surrounding P.M.'s death on the night of January 15, 2014. Multiple people testified about P.M.'s labored breathing, about appellant's girlfriend wanting P.M. removed from the home, and about the struggle to take the moribund P.M. from the home and place him in his car. There was testimony from multiple witnesses that C.F. asked the neighbors for help in removing P.M. from the home. P.M.'s parents testified about P.M.'s condition in the car when C.F. arrived at their home on the night of January 15, 2014. Police officers and EMTs testified about the efforts to resuscitate P.M. The state called multiple witnesses to confirm that P.M. had lethal levels of fentanyl in his system and that he died of a fentanyl overdose. All of this evidence

proves the circumstances of P.M.'s death, but none proves that appellant was involved in the crime that led to P.M.'s death. The critical element in dispute at trial was whether appellant was involved in the sale of the lethal dose of fentanyl.

On that issue, the state's case rests in whole on the testimony of C.F. She, of course, had been afforded immunity in exchange for her cooperation and testimony. The case is therefore precisely of the sort contemplated by section 634.04, where a witness may testify for the state because of "self-serving or malicious motives." *Shoop*, 441 N.W.2d at 479. We must therefore closely examine the record to ascertain whether sufficient evidence corroborates C.F.'s testimony.

In *State v. Heuer*, we considered the defendant's proximity to the crime scene and opportunity to commit the crime. 368 N.W.2d 7, 8 (Minn. App. 1985). We held that an accomplice's testimony was corroborated by testimony that the defendant was seen near the site of a burglary, in the middle of the night, when no businesses were open. *Id.* Additional corroboration included officer confirmation that the defendant had been with the accomplice shortly before the crime, that the defendant had hidden from the officer, and that the stolen property was located where the accomplice said it would be. *Id.* Here, appellant was not located in an unusual place. He was in his own home. Moreover, M.B. testified that appellant was *not* present during the exchange of the money for fentanyl. The only evidence of appellant's willing participation in the fentanyl sale was C.F.'s testimony. And, unlike in *Heuer*, supporting physical evidence described by the accomplice—the black safe and wrappers—were *not* located by law enforcement or were *not* in the location that the accomplice said they would be.

10

In *Pederson*, the Minnesota Supreme Court held that an accomplice's testimony was sufficiently corroborated by physical evidence, by the defendant's admissions that he was with the accomplice both before and after the murder, and by the defendant's failure to deny involvement when the accomplice told other people the details of the murder. 614 N.W.2d at 732-33. The accomplice's testimony in that case was also corroborated by the testimony of a friend who had been told of what happened by both the accomplice and the defendant, and testified that both statements were substantially the same concerning the facts of the burglary and murder, with only minor inconsistencies. *Id.* at 733. Here, the record contains no testimony from witnesses other than C.F. attributing to appellant any statements concerning his involvement in the sale of the fentanyl. Appellant's ex-wife testified to statements appellant made following P.M.'s death and during the investigation, none of which indicate that appellant provided the fentanyl to P.M.

In *Pederson*, the supreme court noted that, because the corroborating witness testified to what the defendant had directly told him, the court was not required to answer the question of whether an accomplice's testimony could be corroborated by the testimony of a witness whose sole knowledge of the crime came from what the accomplice relayed to him. *Id.* Here, the evidence tending to demonstrate appellant's involvement in the sale consists solely of what the accomplice told other people, including M.B., and investigators. M.B. testified that all of the conversations leading up to the fentanyl transaction occurred through C.F. It was C.F who told them to go get money to complete the sale, and M.B.'s testimony was contrary to C.F.'s testimony concerning whether appellant was present during the exchange of fentanyl for money. M.B. testified that appellant was *not* present.

11

M.B. testified that it was his understanding from the text messages with P.M., and the conversation in the car, that the fentanyl would come from C.F.'s father, who had a prescription for it, but he also testified that P.M. never told him that P.M. had arranged a deal directly with appellant.

In *State v. Bergeron*, a murder case, the defendant argued that insufficient evidence corroborated the accomplice testimony, including insufficient evidence that the defendant intended to cause the victim's death. 452 N.W.2d 918, 924-25 (Minn. 1990). In *Bergeron*, the accomplice testified to where the defendant hid the murder weapon and testified that the defendant provided cords to strangle people. *Id.* at 922. Officers discovered a cord and a knife, and the defendant admitted to hiding the knife. *Id.* at 924-25. Physical evidence at the crime scene and the defendant's admissions to police were consistent with the accomplice's testimony and sufficient for corroboration. *Id.* The supreme court noted that the defendant's conduct after the crime, hiding the knife, was a circumstance from which his criminal intent could be inferred. *Id.* at 925. Here, there is an absence of physical evidence linking appellant to the crime of selling fentanyl to M.B. and P.M. Likewise, appellant's testimony, and statements to police, confirmed that C.F., M.B., and P.M. had been in the house and were told to leave by appellant's girlfriend; they do not confirm C.F.'s statements that they arrived at the house to complete a deal to buy fentanyl from appellant.

In *State v. Mathiasen*, an accomplice testified that the defendant had taken a wallet during an altercation at a bar, and the wallet was later located by police where the accomplice said it would be. 267 Minn. 393, 396-97, 127 N.W.2d 534, 537 (1964).

12

Exclusive of the accomplice testimony, the evidence established that the wallet was stolen during the time the victim was in the bar, the victim complained that his wallet was missing, and a physical altercation involving the victim and the defendant occurred. *Id.* at 399-400, 127 N.W.2d at 539. The only evidence indicating that the defendant was actually in possession of the wallet or its contents came from the accomplice. *Id.* at 401, 127 N.W.2d at 540. The supreme court held that the testimony of the accomplice, who had motive to place blame on another person in order to curry favor with law enforcement, was insufficiently corroborated, because no other evidence pointed to the defendant's guilt. *Id.* The testimony of the victim that the defendant was involved in the theft was deemed conclusory and an "expression of his suspicions," but was not sufficient to corroborate the accomplice's testimony. *Id.* The court noted that the association of the defendant and accomplice before the crime was as consistent with innocence as it was with a plan to commit a crime. *Id.*

Here, the state's summation at trial identifies the evidence the state claims is sufficient to corroborate C.F.'s testimony. The state noted in summation that appellant was the only person involved who had a prescription for fentanyl, and he had received a patch from the pharmacy the day before P.M. died. The state argued that P.M.'s text messages with M.B. showed that an arrangement had been reached with appellant. The state argued that M.B.'s testimony about the conversations in the car and his understanding that they were going to appellant's home to buy fentanyl demonstrated that a deal had been reached between P.M. and appellant. It argued that the purchase was from appellant because P.M. and M.B. left appellant's house to withdraw the money needed to buy the fentanyl, as

13

evidenced by an ATM receipt and M.B.'s testimony, and that they returned to appellant's house where P.M. gave the money to C.F. and received a fentanyl patch. The state pointed to appellant's girlfriend having wanted everyone out of the house when it became apparent that P.M. was becoming ill. The state argued that appellant's girlfriend and her sons were untruthful concerning where appellant had been that night, in order to cover for his guilt. The state argued that the girlfriend's delay in opening the door for police, and the fact that fentanyl wrappers were not found in the kitchen garbage can, were also corroborating evidence of appellant's guilt.

On careful review of the trial record (in the absence of any brief by the state), this case is most similar to *Mathiasen*. The evidence that appellant was *actually* in possession of an unopened fentanyl patch, and gave it to C.F. to give to P.M., is based exclusively on the testimony of C.F. Physical evidence does not link appellant to the crime; the discarded outer and inner fentanyl wrappers were not discovered in the kitchen garbage where the accomplice and M.B. claimed they were placed, nor was any black safe discovered by investigators. Appellant's whereabouts at the time of the crime, his own home, is not a suspicious circumstance. Appellant's association with his daughter on the night of January 15 and after is at least as consistent with his innocence as it is with his guilt.

M.B.'s testimony and P.M.'s text messages do point to appellant as the person they *believed* would provide the fentanyl. In this case, the essential element at issue was whether appellant directly or indirectly sold, gave away, bartered, delivered, exchanged, distributed, or administered the fentanyl. *See* Minn. Stat. § 609.195(b) (providing the statutory crime of murder in the third degree). Appellant had a prescription for fentanyl.

14

Somehow, C.F. came to possess one patch, which she delivered to P.M. Absent C.F.'s testimony, the state offered no evidence that appellant willingly gave, sold, or distributed the fentanyl to P.M. And while the testimony of M.B. is similar to C.F.'s testimony in many respects, and thus affirms the truth of her testimony in those areas, C.F.'s testimony concerning the transfer of the fentanyl, the central issue, is not corroborated by any other evidence. *See Mathiasen*, 267 Minn. at 401, 127 N.W.2d at 540 (reversing a conviction where the state presented no corroborating testimony or evidence that the defendant possessed the item at issue).

The precise amount of corroboration necessary to affirm the truth of the accomplice's testimony depends on the circumstances of the case. *Clark*, 755 N.W.2d at 253-54. M.B. did not see appellant with the fentanyl or cash, appellant did not speak about fentanyl or cash when C.F. introduced appellant to M.B. and P.M., and all communications of the buyers concerning fentanyl or the transaction occurred with and through C.F. Viewing the corroborating evidence in the light most favorable to the state, the circumstances of P.M.'s procurement of the fentanyl are as consistent with appellant's innocence as they are with his guilt. *See Wallert*, 402 N.W.2d at 572 (providing that corroborating evidence is insufficient if it is as consistent with the defendant's innocence as it is with guilt).

In response to appellant's motion to dismiss at the close of the state's case at trial, the prosecution argued that appellant having had a fentanyl prescription, and the likelihood of his having had one unused patch as of the date of the event if all of his patches had been used as prescribed, sufficiently corroborates C.F.'s testimony. But even if it is true that

15

appellant had an unused patch, the only record evidence indicating that appellant participated in the sale of the fentanyl is the testimony of C.F. herself. As was the case in *Mathiasen*, the possible or even likely existence of an unused fentanyl patch is as consistent with C.F. having sold the fentanyl without appellant's involvement as it is with appellant having enlisted C.F. to make the delivery for him. 267 Minn. at 401, 127 N.W.2d at 540.

In its summation at trial, the state argued that appellant's girlfriend not having promptly answered the door for the police in the middle of the night and the lack of fentanyl wrappers in the kitchen trash corroborates C.F.'s testimony. Here again, those circumstances do not "point to the guilt of [appellant] in some substantial degree." *Chavarria-Cruz*, 839 N.W.2d at 519. Commander Ferrell testified that the girlfriend answered the door within a minute or two of walking downstairs. Whether she threw on a bathrobe, used the bathroom, or otherwise prepared herself to open the door in the middle of the night is not disclosed by the record. That a citizen does not respond to a middle-of-the-night rapping at the door as promptly as the police would prefer is not evidence of guilt.

Lastly, the state argued in summation that C.F.'s testimony implicating appellant in the fentanyl sale was particularly credible because she did not implicate appellant until June. Then, and despite having repeatedly told police different versions of the events, "[C.F.] did get immunity . . . . Now she can tell [police] the truth." We are aware of no authority for the proposition that an accomplice's inconsistent statements can sufficiently corroborate the accomplice's later inculpatory testimony. To be sure, C.F.'s earlier statements are demonstrably false. But that does not corroborate her testimony or "restore confidence in the truth" of her later testimony implicating appellant in the fentanyl sale.

16

*Clark*, 755 N.W.2d at 253. To the contrary, her proven and admitted lies undermine the veracity of her post-immunity testimony implicating appellant in the sale. If there is a case where the timing or circumstances of an accomplice's multiple statements may be sufficient corroboration, this is surely not such a case. Instead, this case is an exemplar of the concern underlying section 634.04. *See Shoop*, 441 N.W.2d at 479 (recognizing that section 634.04 is the embodiment of "long-standing mistrust" of accomplice testimony, so mistrusted because of the risk that an accomplice "may testify against another in the hope of or upon a promise of immunity or clemency"). The record here is devoid of evidence corroborating C.F.'s testimony that appellant directly or indirectly participated in the sale of fentanyl.

We reverse appellant's conviction as resting only on the uncorroborated testimony of C.F. Because we reverse the conviction on that basis, we do not address appellant's other arguments.

**Reversed.**